## Case No. 9,188.

### The MARY.

[1 Spr. 17;[1] 5 Law Rep. 75.]

District Court, D. Massachusetts. March, 1841.

SHIPPING—GENERAL AVERAGE—WAGES AND PROVISIONS — PORT FOR SAFETY — TIME OF DETENTION — CARGO INJURED — DESTROYED BY FIRE—REASON FOR LANDING CARGO.

1. Wages and provisions are to be allowed in general average from the time when a vessel in distress alters her course to seek a place of safety.

[Cited in The Star of Hope, 9 Wall. (76 U. S.) 236, 237.]

2. If masts are cut away at sea, and the vessel lies for a time disabled, and afterwards alters her course and puts away for a port of safety to refit, wages and provisions are not allowed in general average during the time of such detention, but only from the time of altering her course.

[1] [Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

3. Semble, if by cutting away the masts the deck is ripped up, and by that means water gets in and injures the carge, such damage to the cargo is to be paid for in general average.

4. If a vessel, from perils of the sea, is compelled to seek a port of safety, and there the cargo is necessarily landed and stored in order to repair the vessel and to enable her to proceed on her voyage, and while thus stored is destroyed by fire, it must be paid for in general average. But if the cargo was landed and stored because it was damaged, and is destroyed by fire while thus stored, it is not to be paid for in general average. If both these causes for landing and storing the cargo concur, and it is destroyed by fire, it is not to be paid for in general average.

[Cited in The Charles F. Perry, Case No. 2,-616; Dupont v. Vance, 19 How. (60 U. S.) 171.]

[Cited in Gage v. Libby, 14 Allen, 269. Approved in Dabney v. New England Ins. Co., 14 Allen, 310.]

5. Where by a charter-party a gross sum, not divisible, was to be paid as freight for the round voyage out and home, the principal object of the voyage being to obtain a return cargo, and a general average has occurred on the outward passage; held, that the whole freight for the round voyage must contribute.

[This was a suit in admiralty by Shelton and others against the brig Mary.]

E. Blake and F. C. Loring, for libellants.

B. R. Curtis, for respondents.

SPRAGUE, District Judge. The questions, which have been presented in this case, relate to the adjustment of general average. First, from what time is the allowance for wages and provisions to commence? It is admitted to be the general rule, that it is from the time when a vessel in distress alters her course to seek a place of safety. There is a controversy here as to the time when the brig so altered her course. Her masts were cut away on the 10th of February. The protest of the master, mate and two seamen, states, that from that time until the 19th, the brig lay disabled, sometimes in the trough of the sea, but most of the time with an anchor out, to keep her head to the wind; and that on the 19th "at 8 a. m., kept her off S. S. W., concluding to run for St. Thomas." The log-book is said to be mislaid and is not produced, but the protest refers to and professes to conform to it.

The captain, in his first deposition, says, that the day after the accident "we set out for Nassau, New Providence, but finding we could not fetch there on account of westerly winds, we laid for St. Thomas; but thinking it not safe to run through the islands, I stood for Antigua. I did this on the 21st of March." By the day of the accident, I presume is meant the 10th of February, and if so, the statement does not correspond with the protest, which describes the condition of the vessel, and the measures taken to have been such as to repel the idea of her then setting out for Nassau, or indeed any other place. Nor does it correspond with the previous statement of the captain in the same deposition, for he says: "The eleventh we got clear of the wreck of the

mainmast, got the water out of the vessel and got the cargo trimmed; after that we lay about twelve days a wreck without trying to get along, with one anchor down to keep her head to the wind." [Further on the deposition states, that the "day after the accident we set out for Nassau, but finding we could not fetch there, on account of westerly winds, we laid for St. Thomas." Now, when did they lay for St. Thomas? On the 19th, only nine days after the accident, during all which time the captain himself had just before stated, that they lay a wreck without trying to get along? How then could they, during any part of that time, have been endeavoring to get to Nassau, and found that they could not fetch by reason of the westerly winds?][2] There is something inexplicable in these two statements of the captain; and the protest made under oath, by the master, mate, and two seamen, on their arrival at the first port after the disaster, must prevail over the inconsistent statements of the deposition.

But it is urged, that the inability of the vessel to proceed from the 10th to the 19th, was caused by the previous voluntary sacrifice of the masts, and that the wages and provisions should therefore be paid for in general average. Suppose that the vessel, instead of putting away on the 19th, had proceeded to her original destination and arrived in safety,—would wages and provisions be paid for during the delay? If so, then in every case of the cutting away of a spar or other voluntary sacrifice, which protracts the voyage, this allowance must be made for the time the voyage is extended. But I cannot consider such consequential loss a voluntary sacrifice of wages and provisions for the common benefit. The allowance for them in this case must, I think, begin on the 19th of February.

In the second place, it is testified, that by cutting away the masts the deck was ripped up, and thereby salt water was let in, which injured the cargo, and that such damage should be paid for in general average. The fact is contested. The burden is on the owner of the cargo, and I do not think that he has sustained it by the evidence. No allowance, therefore, is to be made for this alleged damage. The cargo was landed and stored at Antigua, and a part of it destroyed by fire. Shall this be brought into general average? If it was landed and stored in order to repair the ship, then this new risk was incurred for the general benefit, and should be allowed upon the principle of the case in 1 Magens, 160. But if it was landed and stored because the cargo was damaged, then the new risk was incurred only for the benefit of the cargo, and the loss is particular average. But the evidence shows, that both causes concurred. The report of the surveyors ordered the cargo to be landed in order to examine the ship, and it was so much damaged that it could not have remained on board.

No decided case applicable to such a state of facts has been cited, and we must recur to original principles. Property is paid for in general average from justice and policy. It is just, that he whose property has been sacrificed for the general benefit, should bear no more than his proportion of the loss; it is good policy, because the owner who may be supposed to be present personally, or by his agent, is thereby induced to make less resistance to an act, which is deemed conducive to the common good. But this rests entirely upon the supposition, that there has been a voluntary and intentional sacrifice for the general benefit. In the case before us, the cargo was so damaged as to render its removal from the vessel indispensable. The owner had no option. I cannot therefore consider him as having made a voluntary sacrifice for the purpose of prosecuting the voyage. The goods consumed by fire are not, therefore, to be brought into general average.

The next question is, in what manner the freight shall contribute. By the charter-party a gross sum was to be paid for the round voyage out and home. It was not divisible. The principal object of the voyage was to obtain a return cargo, and there were but few articles on board on the outward passage, when the disaster occurred. Three modes of assessing the freight have been proposed: (1) That the whole freight for the round voyage should contribute. (2) That it should be divided, and that only the proportion for the outward voyage should contribute. (3) That only a fair freight on the articles actually on board should contribute. In Williams v. London Assur. Co., 1 Maule & S. 318, cited by the counsel for the libellants, it was decided by the court of king's bench, that the whole freight for the round voyage is to contribute. This is expressly approved by Mr. Hughes in his treatise on Insurance (page 298). In the case of The Progress, Edw. Adm. 210–224, military salvage was assessed on the same principle, and this appears not to have been new in that court; for Sir William Scott, in delivering his judgment says, that, "where a ship goes out under a charter, to proceed to her port of destination, in ballast, and to receive her freight only upon her return, the court is not in the habit of dividing the salvage." The case of The Dorothy Foster, 6 C. Rob. Adm. 88, tends to sustain the same doctrine. On the other hand, Mr. Benecke insists, that in such cases the freight ought to be divided, and such part only contribute as may fairly be presumed to belong to the outward voyage: and Mr. Phillips concurs in this opinion. Phillips' Stevens & B. Ins. 255, 257, note a.

The arguments of Mr. Benecke are entitled to consideration,—and at least show, that the question is not free from difficulty. But they are by no means conclusive. He first urges, that if the whole freight out and home should contribute for a loss upon the outward passage, it may also be called on to contribute

---

[2] [From 5 Law Rep. 75.]

for a loss on the homeward passage, while the outward cargo only would contribute to the first, and the homeward cargo only to the second general average. But would not the vessel in such case contribute to both? And if the same cargo or a part of it, as sometimes happens, were on board, out and home, that also would contribute to both. But suppose a portion of the freight, one-half, for example, is assessed for the outward loss, is not the whole at risk on the homeward passage, and liable to contribute for any general average there incurred? If so, the alleged inequality still exists, only in a less degree. His next objection is, that as the freight is not to be paid until the vessel shall have arrived in safety at her home port, expenses and risks are still to be encountered in earning it; for example, wages, provisions and disbursements at the port of destination; and that as none of these expenses would have been incurred, if the vessel had been lost by the misfortune which gave rise to the general average, the crew cannot be said to have saved the whole freight, after the arrival of the ship, at the end of the outward voyage. This is indeed a strong argument to show, that a deduction for these expenses ought to be made from the round freight, in determining the amount upon which the contribution should be levied; but has no tendency to prove that the residue, after making these deductions, ought not to contribute. On the contrary, the author seems to admit (page 259) that the owner ought to contribute for what the thing saved is worth; and the freight is worth the round sum, less these deductions. And Mr. Phillips, in a note to Stevens and Benecke (page 255), says: "The freight pending at the time of the jettison or other sacrifice contributes to the average; and if wages and provisions are to be subsequently expended in order to save the freight, the expense of them is to be deducted in ascertaining the amount in which freight is to contribute." See, also, 1 Phil. Ins. 360, 361; and 2 Phil. Ins. c. 15, § 11, note 2. And that such deduction is to be made in ascertaining the contributory value of the freight, is directly decided in Spafford v. Dodge, 14 Mass. 66. Neither in Williams v. London Assur. Co., nor in the case of The Progress, did the court decide as to the amount for which the freight was to contribute; that question was not raised.

It is further objected by Mr. Benecke, that the freight is still at risk, while the vessel and cargo are in safety. This point was fully considered in Williams v. London Assur. Co., and was necessarily before the court in the case of The Progress. And that safety is not essential to render it contributory is decided in Spafford v. Dodge, and conceded by Mr. Phillips in the extract I have just quoted, and also by Mr. Benecke himself, who says, (page 259): "When disbursements of the nature of a general average take place in the course of a voyage, and that voyage be continued, the parties pay their respective shares, not for actually gaining possession of their property, which still remains exposed to future perils of the navigation, but for the probability of the property coming ultimately to their hands."

Another argument urged by Mr. Benecke is, that it would lead to singular consequences, if the ship-owner could be liable to contribute for any other freight than that of the goods actually on board, or of such as the law considers as being actually on board. And by way of example, he says, "a vessel bound from A. to B. may be chartered to another party before her arrival at B. for a voyage from B. to C. If a general average should take place upon the voyage from A. to B., would it not be absurd to make the freight for the intended voyage from B. to C. also liable, because it was also at stake." Without undertaking to point out in detail in what respects the two cases differ, it is sufficient to say, that there is such a vested interest in the freight for the round voyage which has been commenced, that the whole is insurable; but as to the voyage which has not been entered upon, it is not so. Here is a marked distinction between the two cases, recognized by the commercial law. But the argument rests upon the supposition that there is no difference between them. Mr. Benecke, following out his reasoning to its legitimate consequences, says, that when a vessel is sent out in ballast under charter-party to bring a cargo home, the freight for the homeward cargo ought not to contribute toward a general average loss occurring on the outward bound passage. But to this Mr. Phillips does not agree, and places his dissent on the ground, that the homeward freight, that is, the freight for the round voyage, is at stake, and is insurable from the time the vessel breaks ground on the outward passage, and then argues that on an adjustment of an average on the outward or homeward passage, it should be apportioned and contribute on a proportion, in each case. But is such the legitimate conclusion from his premises? If the whole be at risk, then the whole is saved, and ought to contribute just as much as the whole vessel, which contributes in both cases. But upon what principle is it to be argued that the whole freight upon a round voyage, which is in no part earned or payable until the arrival of the vessel at her home port, is not to contribute to a general average loss occurring on the homeward passage? Is not the whole at risk? Is not the whole saved? Is it not the principle upon which the assessment is to be made, that every one shall contribute in proportion to the benefit received? And the owner is benefited to the whole amount of his freight then depending. I have not attempted to exhaust the argument, but merely to present some reasons why I prefer reposing on decided cases, rather than on the reasoning of Mr. Benecke

and Mr. Phillips. I am of opinion that, in this case, the freight for the round voyage must contribute.