CARRIGO (UNITED STATES v.). See Case No. 14,735.

CARRILLO (UNITED STATES v.). See Case Nos. 14,736 and 14,737.

## Case No. 2,445.

### CARRINGTON v. The ANN C. PRATT.

[10 N. Y. Leg. Obs. 193.][1]

District Court, D. Maine. July Term, 1852.

BOTTOMRY—FRAUD—BOND GOOD IN PART—MATE—QUALIFICATIONS—DEVOLUTION OF COMMAND.

1. A bottomry bond, made for a larger sum than is due, for the purpose of being used to defraud underwriters is void, and no remedy can be had upon it, although no fraud was intended against the owners of the vessel.

[Cited in The Grapeshot v. Wallerstein, 9 Wall. (76 U. S.) 135.]

2. The rule of the admiralty, which holds that a bond may be good for a part and bad for a part. does not apply to the one made for the purpose of defrauding the insurers. But a fraudulent bond will not necessarily vitiate the consideration so far as it is meritorious. For so much the creditor may recover by process in rem, on the hypothecation implied by law.

3. When the master is separated from the ship by death or other casualty the mate succeeds to the command as heres necessarius. The possibility of this command being devolved on him is a contingency contemplated by his engagement, and he engages for a competent degree of skill in seamanship and navigation for the management of the ship on the happening of this event. He is also entitled to the ordinary

[1] [Reversed by the circuit court in The Ann C. Pratt. Case No. 409; decree of the circuit court affirmed by supreme court in Carrington v. The Ann C. Pratt, 18 How. (59 U. S.) 63.]

presumption in his favor. that he acted with fidelity and ordinary skill until the contrary is proved.

The brig Ann C. Pratt sailed from Frankfort Nov. 7, 1850, on a voyage to the Western Islands, and thence to such foreign port or ports as the master should determine. On her outward passage she encountered heavy gales, squalls, and had fresh breezes during the whole time. She labored badly and leaked from the commencement of the voyage, although she had been overhauled, and was supposed to be thoroughly repaired, so that three days after sailing, it was found necessary to lighten her by throwing over nearly the whole of her deck load. She arrived at Terceira on the 29 of November. Here she discharged part of her cargo and took part of another. From Terceira she sailed for St. Michael, Dec. 30, and made land the next day, but by a continued series of gales, squalls and bad weather, they were prevented from making a harbor till the 11th of January, when the vessel was brought to anchor and moored at Villa Franche, an open roadstead. She lay there till the 13th, when, the captain being ashore, the brig was struck by a heavy squall, which drove her from her moorings, with the loss of all her cables and anchors except part of her best bower chain. The squall struck her from the N. W., but soon veered round to the W. S. W., driving her directly on shore, so that the hands on board, to save themselves from being driven on the rocks were obliged to stand off. On the same day in the afternoon as is stated in the depositions of Airey, and M'Donald, the second mate, there was a consultation of the crew to consider what was best to be done. The crew on board at this time consisted of the second mate, two able seamen, one of whom, Hurris, was sick below, two ordinary seamen, one a Portuguese, who spoke English very imperfectly, and two boys, one only of whom spoke English, and the cook. With the exception of Airey and the second mate, the other members of the ship's company say that they knew of no consultation of the crew. If there was any, it must have been very informal, and though Airey and M'Donald both say that the opinion of the crew was in favor of proceeding to St. Thomas, which was the port that the master had determined to proceed to next. instead of attempting to return to St. Michael or bearing away for an eastern port, it is evident that Airey in doing this, must have been governed by his own opinion in concurrence with that of the second mate. On her passage for three or four days, the brig leaked badly till she took the trade winds, and from that time she made her voyage without difficulty. and arrived at St. Thomas the 6th of February. Here Airey called on the American consul, and had, under his warrant, a survey. In a written report the surveyors stated the repairs that in their opinion were required

to make her seaworthy. Three master shipwrights, the only persons in the place who undertook such business, were applied to for proposals or tenders for making the repairs ordered by the surveyors. and the contract was made with Pland, whose offer was the most favorable. The money for making the repairs, and to meet the other necessary charges for supplies while she was under repairs, and for fitting her for her return voyage, beyond what the master had on board and the proceeds of the sale of the cargo, was advanced by the libellant, Nehemiah Carrington, under an agreement with Airey on the security of a bottomry bond; and a bill of exchange drawn for the sum claimed, on the payment of which the bond was to be held satisfied and cancelled. The bill having been protested, this suit was commenced on the bond.

Rowe & Bartlett, for libellant.
Willis & Fessenden, for respondents.

WARE, District Judge. Several objections have been made to the libellant's right to recover in this case. In the first place it is said that it was the duty of Airey when he was blown off by the gale, to have returned to St. Michael's and restored the command of the vessel to the master, and that there was nothing in the state of the weather that rendered this impracticable. But whatever fault may have been committed by Airey in this part of his conduct, whether an error of judgment or a delinquency of a graver character, it cannot affect the libellant. The vessel came into St. Thomas in distress. It is certain that repairs were needed. There was a regular survey by competent surveyors, appointed by the American consul, and there is nothing in the evidence to impeach the fairness and honesty of the surveyors. The libellant knew nothing of the causes which brought her there, without her master and without her papers, except what he could learn from Airey and the crew, and their account sufficiently explained the fact. On the separation of the master from the vessel by death or casualty, the mate succeeds to his authority as heres necessarius; the law imposes on him the duties and responsibilities, and clothes him with the authority of master. This substitution is a contingency that is contemplated by his engagement, which cannot be declined by him but by a default of duty. Arriving at St. Thomas as he did, he had all the authority to order necessary repairs, and to make all contracts for that purpose that he would have had, if he had been originally appointed master. The circumstances under which he arrived, it may be said, ought to suggest caution and prudence, and to awaken the vigilance of those who dealt with him, but his authority was the same as would have been that of the original master. Airey, who was now the acting master, not having the control of means adequate to meet the

cost of repairs, and being unable to obtain them on the personal credit of the owners, was authorized to borrow on the credit of the vessel. But it is said that this authority, having its origin in necessity, is limited to the cost of such repairs as are indispensably necessary to enable the ship to proceed on her voyage; that the repairs ordered exceeded that necessity, and that beyond this the master has no authority to charge the owners by a resort to the onerous expedient of a bottomry bond. And it is argued that beyond this there was a want of prudence and a wasteful extravagance in making the repairs that were made.

This argument presents itself with a double aspect—First, as it touches the rights of the lender; and secondly, as it questions the discretion and good faith of the master. As it affects the bottomry creditor, the answer appears to me to be very obvious. All that is required of the lender in such cases, is to be assured that an unprovided necessity exists, and that the means cannot be obtained on the personal credit of the owners. If the money is then advanced in good faith, without collusion with the master for the purpose of fraud, the lender is not bound to see to its application. Emerig. Tracts à la Grosse, c. 4, § 7; Dig. 14, 1, 1, 59; The Jane, 1 Dod. 465. If the sum advanced is somewhat more than is strictly necessary, unless the lender's suspicions are justly awakened by gross and manifest extravagance, his claim under his bond will not be impaired. For when a case of apparent necessity exists, the law does not impose on him the responsibility of determining the extent of repairs required. The lender, says Emerigon, is justified in relying on the honesty of the master; and besides, if he were required to decide on the nature and necessity of repairs. it would be requisite for him to be an expert in the business,—il faut être du métier.

As relates to the master the arguments apply with more force. His authority to borrow money on bottomry is strictly limited to the necessities of the ship; and in order to justify himself to the owners, he must show the extent of the necessity. But then the question will return, what in the sense of the law are necessary repairs? The text-writers on this subject merely use the words necessary repairs, without proceeding to describe, except in very vague and general terms, what they are. In what sense then is the word necessary used in this connection? Is it, in the strict sense, repairs that are indispensable to enable the vessel to proceed on her voyage, or is it, in a more loose sense, such as are proper, fit and suitable under the circumstances? This question was raised and very fully considered by the circuit court, in the case of The Fortitude [Case No. 4,953], and the conclusion to which the court arrived, after a very elaborate examination of the theoretical writers as well as the judicial decisions on the subject, was that the word necessary was used in the latter sense, as including what was proper and suitable under the circumstances. The same doctrine in substance was held by Lord Tenterden, in the case of Webster v. Teekamp, 4 Barn. & Ald. 354.

The proper test to determine what in the sense of the law are necessary repairs, is found by inquiring what a prudent owner, having a proper regard to the safety of the property at risk, and the security of the lives of the crew, would do if he were present. In this case the repairs ordered by the master were only such as were recommended by the surveyors in their report, and this, it appears to me, is sufficient to exonerate the master from any imputation of bad faith.

But the most difficult objection to be overcome is the charge of meditated fraud; not on the owners of the vessel, but on the underwriters. To enable the owners to perpetrate the fraud, two sets of papers and accounts were made up by the libellant, one for the owners, by which the matter was to be settled and the payment made. This account made the whole cost of the repairs to be $4,460.83. Deducting $310.60 for cash received of the master; $216.85, the avails of the sale of the cargo; $250, discounted by Pland, the contractor, who made the repairs, —left $3,683.38 as the amount actually advanced by the libellant; and adding the maritime premium, $193.87, it amounts to $3,877.25. For this sum a bill of exchange was drawn by Airey on Seth Pratt, the father of the master and owner, he having been left at St. Michael, and not expected to return in season to meet the bill. Together with the bill a written agreement was sent, by which the libellants agreed to discount the maritime interest, and to take $3,683.38 in satisfaction of the bond. provided the bill was duly honored and the payment duly made. With these papers another package of accounts and papers was sent, for the use of the owners in adjusting and settling the loss with the underwriters. These accounts showed the cost of the repairs to amount to $4,712.57, and after deducting $216.85, the sum received from the sale of the remains of the cargo, but without any deduction for the cash received of the master or the discount of the contractor, left the amount advanced by Carrington $4,591.42. and for this sum the bond was executed, which, with the addition of the maritime premium. amounts to $5,050.56. The reason given by Carrington, in his letter to Seth Pratt, to whom the papers were sent, for preparing this duplicate set of accounts, is, that it was "done to protect your son's interest; for doubtless you are aware that there are many charges. attending vessels similarly circumstanced as the Ann C. Pratt, which the insurers and underwriters will not admit; consequently owners of vessels have to protect their interests and make up their accounts in such a form as their officers

will admit of." After this explanation of the fabricated papers and accounts, he proceeds to say: "The other package of papers relate to the owners and in the account current, which will be there found, the facts and original charges are those set forth, showing the balance due to us to be only $3,877.25, and for which amount Capt. Airey has given us a draft on you, and we have an agreement with him, as we do have with all others, who favor us with their business similarly circumstanced, that we are to relinquish the 10 per cent. maritime premium which persons making advances on vessels exact." The calm self-possession and air of frankness with which all this is disclosed would lead one to suppose that such practices belonged to the ordinary usages and common business habits of the place; and I feel a secret persuasion that I might do injustice to Messrs. Carrington & Co. to impute to them a greater looseness of mercantile morality than is customary in such transactions in that community, or perhaps in other commercial places, under like circumstances. But I feel bound to say that I cannot view such practices, even if sanctioned to some extent by custom, in the same light in which the interested parties appear to contemplate them, and I trust that I shall be doing no disservice to the general interests of commerce by suggesting that they cannot be tolerated in a court of justice. The letter of Carrington shows that the bond was executed for a larger sum than was due, and that false accounts were fabricated to support the bond and to enable the owners to extort from the underwriters a larger sum than by their contract they were bound to pay.

It being apparent that the bond is tainted with fraud can an action be maintained upon it? In the admiralty a bond may be good for a part and bad for a part. If demands are mixed up in it for which the creditor is not entitled to claim maritime interest, as for money which had been previously advanced on the personal credit of the owner, with other advances for which he had stipulated for this security, this will not vitiate the bond in toto. He may recover upon it so much of the consideration as is good, and it will be rejected for the residue. The Aurora, 1 Wheat. [14 U. S.] 96; The Hero, 2 Dod. 146; The Packet [Case No. 10,654]. But I am not aware that this equitable indulgence has ever been extended to a fraudulent bond. From the language of Lord Stowell, in the case of The Tartar, 1 Hagg. Adm. 14, I infer the contrary. "This court," he says, "proceeding on principles of general equity, does not hold that a bottomry, bad in part, necessarily vitiates the rest." But he immediately adds, "It may be invalidated by a case of fraud and ill conduct of the party; and if such a charge could be established, then indeed this bond would share the fate of the other unprofitable transactions connected with this vessel." A plain intimation

that a bond tainted by fraud is even in the admiralty a totally void instrument. The fraud to which Lord Stowell alludes is undoubtedly a fraud on the owners, and in the present case, as all the facts were disclosed and explained, no fraud was attempted or intended on them. But in its original concoction, it was intended to operate as a fraud on the underwriters, who were ultimately to bear the loss; and in morals it certainly makes no difference, and ought to make none in law, whether the fraud was intended to affect the primary or the ultimate party who was to suffer by the loss. But even if the usurers are to be considered as third persons and strangers to the transaction, a bond is sometimes, even by the rigid rules of the common law, held to be void when it is intended to operate as a fraud on a third person, though it may be perfectly fair and unimpeachable between the parties. Such was the case of Boynton v. Hubbard, 7 Mass. 112. That action was on a post obit bond, and though the jury found that the transaction was fair and free from fraud between the parties, judgment was arrested, and the bond held to be void on principles of public policy applicable to such transactions, because it operated as a fraud on third persons. And it appears to me that such a bond as this, framed with a view of practising a fraud on underwriters, ought to be held void, though as between the immediate parties there is no fraud. It is easy for parties in foreign countries to make up accounts and find vouchers to sustain exaggerated losses, and it is difficult for underwriters to detect the fraud that is concealed under fabricated papers. They are obliged to increase their premiums on fair and honest ship owners to cover risks of this kind. And it seems to me when a bottomry creditor lends himself to a transaction of this kind, though he may not derive any direct profit from it himself, that a proper regard to the best interests of fair and honest trade as well as a due respect for commercial morality requires that the bond should be held to be void, and the creditor left to seek such other remedy for the amount justly due as his case admits. Under these views of the subject, I must pronounce against the bond. If I have come to a wrong conclusion, I am happy that my opinion is open to be reviewed by a higher court. But though the bond be void, this does not of necessity vitiate the consideration for which it was given, so far as it was meritorious. For repairs and supplies furnished the law gives a lien on the vessel without any instrument of hypothecation, which the creditor may enforce by process in rem. The counsel for the libellant has amended his libel by filing an allegation to meet this posture of the case, founded on the consideration, in which he claims the actual amount advanced for the repairs and supplies. This I have no doubt of his right to recover. In the account current which is

supported by regular vouchers, this appears to be $3,683.38. But this being awarded on the hypothecation implied by law, does not carry maritime interest.

[NOTE. The claimant, Leonard B. Pratt, appealed to the circuit court, where the decree herein was reversed, and the libel dismissed. See The Ann C. Pratt, Case No. 409. The libellant then appealed to the supreme court, where the circuit court decree was affirmed. See Carrington v. The Ann C. Pratt, 18 How. (59 U. S.) 63. For the grounds of affirmation, see note to The Ann C. Pratt, supra.

[The case of Arey v. The Ann C. Pratt, for wages, was heard and decided at the same time, and is reported with this case in 10 N. Y. Leg. Obs., at page 190. See Case No. 113a.]