## JOHN S. EMERY & others *vs.* EDWARD B. HUNTINGTON & others.

An American barque, being in inevitable danger of colliding with an English steamer, by reason of the failure of the steamer to keep out of the way, in order to lessen the danger put her helm to starboard and struck the steamer stem on, injuring the steamer and herself; and if she had not put her helm to starboard, she would probably have been sunk with her cargo. In consequence of the damage, she was obliged to go for repairs into a port of a country where the duty of a steamer to keep out of the way of a sailing vessel was not recognized, and where she was arrested at the suit of the steamer, proceeded against before a court which decreed that the damages to the steamer and the barque should be borne one half by each, and that she should therefore pay a certain sum to the steamer; and this sum she had to pay, to procure her release. *Held*, in a suit in equity brought by the owners of the barque against the owners of her cargo for contribution, that neither the expenses of the repairs rendered necessary by the collision, nor the sum paid to the steamer, nor the expense of the proceedings before the court was a subject for general average.

BILL IN EQUITY, filed June 6, 1871, by John S. Emery and fifteen others against Edward B. Huntington, Sebastian B. Schlesinger, George P. King and Barthold Schlesinger, doing business under the name of Naylor & Company, and George H. Peters, William C. Peters and Joseph P. Ellicott, doing business under the name of E. D. Peters & Company, alleging that the plaintiffs were owners of the barque Megunticook; that the barque, on August 13, 1870, while upon a voyage from Stockholm to Boston with a full cargo of iron, nearly all of which was consigned to the defendants, came into collision with the English steamer Hugh Taylor, about six miles from the coast of Denmark; that when the vessels came in sight of each other, the barque kept on her course, as the laws of the United States, agreeing in this respect with the laws of England and of most commercial nations, required her to do; that the steamer ought to have kept out of the way of the barque, as she had ample opportunity to do, and as the laws of England, agreeing in this respect with the laws of the United States and nearly all commercial nations, required her to do; but that the steamer did not keep out of the way of the barque, and instead thereof, when very near the barque, suddenly ported her helm and kept off across the barque's bow, and by that movement rendered a collision between the two vessels inevitable; that everything was done on board the barque which law and good seamanship required to avoid collisions; that the collision was wholly caused by the negligent and illegal conduct of the persons in charge of the steamer; " that when it became apparent to the master and others in charge of the barque that a collision was inevitable, and that, as the barque was then heading, there was imminent danger that it would cause the sinking of the barque and the total loss of her cargo and freight, and of the lives of all on board, the master, to diminish the effect of the impending blow, and enable the barque to strike the steamer stem on, ordered her helm put hard to starboard, and thereby succeeded in changing her course so far to port that she struck the steamer's broadside, stem on; that by striking the steamer in this manner the barque was greatly damaged, her jibboom, cutwater and bob-stays were carried away and her stem was crushed from the top

downward, several feet below her water line when light, and two of her breast-hooks broken; that the barque, her freight and cargo, were in imminent danger, and would in all probability have been totally lost, if the barque had not been voluntarily run upon and against the steamer in the manner aforesaid, and the damage above described voluntarily incurred; that the barque was so run upon and against the steamer, and the damage voluntarily incurred, for the safety and preservation of the barque, her cargo and freight and the lives of the persons on board, and by means thereof the same were saved; and that after the collision and damage had taken place, in the condition the barque then was, it was impossible for her to proceed on her voyage, and she was in fact in imminent danger of being lost, so that it became absolutely necessary for the safety and benefit of vessel, cargo and freight, to go into the harbor of Copenhagen to repair the barque, and she went there accordingly."

The bill then alleged " that while at Copenhagen proceedings were commenced by the owner of the steamer, in the maritime and commercial court of Copenhagen, for the recovery of damages done to the steamer by the collision, she having also put into Copenhagen for necessary repairs; that thereupon the barque was seized for security for such damages as should be recovered in such proceedings; that after a hearing the court decreed that the damages to both vessels should be aggregated and equally divided between the parties, and, in applying this rule of damages, and the damages suffered by the barque being first deducted, that there remained to be paid to the owner of the steamer on behalf of the barque the sum of 5472 rix-dollars, with interest, and that the seizure of the barque should remain in force for that amount; that in order to get possession of the barque to be used for the prosecution of the voyage, or for any purpose, it was necessary to pay said sum, and it was accordingly paid on behalf of the owners of the barque, with interest; that in rendering said ͺecree the court proceeded under a Danish law, in substance as follows : ' Where two vessels sailing meet and are unable to avoid each other, but both sustain damage, then both masters with their crews shall make oath that it happened unintentionally and

not with design, and then both masters shall bear the damage, each of them for one half share, whether it occurs by day or by night;' that there is no law in Denmark requiring steamers to keep out of the way of sailing vessels; that the court did not find the barque in fault for the collision, but held that it was a common accident, under the rule of law above set forth, and that the damages must be borne as in said rule provided; that when, to avoid being sunk by the impending collision, the barque changed her course, so as to strike the steamer's broadside stem on, she by that movement inflicted a severe blow upon the steamer, and so caused the damages to the steamer for which by the decree of the court payment was ordered and made; that the damages so inflicted voluntarily upon the steamer and the payment for the same are to be regarded as a voluntary sacrifice made by the master of the barque for the safety and benefit of the barque, her cargo and freight; that in consequence of entering the port of Copenhagen, the barque and her pending freight became subject to the Danish law and to the jurisdiction of the Danish court, became liable to be and was seized by the order of the court, and was forced to submit to its jurisdiction, abide its decree, and pay the sum of money decreed by it as aforesaid, and also to incur heavy expenses in making defence against said claim and in other proceedings for the promotion of the defence; and that, inasmuch as entering said port voluntarily for the purposes above set forth was for the benefit of the barque, her freight and cargo, the sum paid in pursuance of the decree of the court and for defence as aforesaid is to be regarded as a voluntary sacrifice for the common relief and benefit of the barque, cargo and freight, and all interested therein."

The bill further alleged that the cargo was saved, and was carried to its destination and delivered to the defendants; that the plaintiffs were entitled to contribution from the defendants for expenses in repairing the damages done to the barque by the collision, for the sums paid for the damages done to the steamer, and for the expenses incurred in the defence of the proceedings in the court at Copenhagen; and that a general average adjustment was properly prepared. The prayer was, that the defendants

might pay the sums due from them according to this adjustment.

The defendants demurred to the bill for want of equity; and the case was reserved by *Colt,* J., on the bill and demurrer, for the determination of the full court.

*H. C. Hutchins & A. S. Wheeler,* for the defendants.

*J. C. Dodge,* for the plaintiffs.

GRAY, J.   In order to support a claim for contribution in general average, there must be an extraordinary and voluntary sacrifice of part of the interests at risk for the benefit of all, by which part is rescued from the imminent peril impending over the whole. The danger encountered by the election of the master may be either of a different kind from the danger avoided, or of the same kind; but it must not be the very same danger, merely modified by acts done by the master, in the performance of his ordinary duty in the navigation or management of the vessel, so to meet the impending peril as to diminish its effects as far as possible. *Nickerson* v. *Tyson,* 8 Mass. 467.   *Scudder* v. *Bradford,* 14 Pick. 13.   Bigelow, C. J., in *Merithew* v. *Sampson,* 4 Allen, 192, 195. *Slater* v. *Hayward Rubber Co.* 26 Conn. 128.   Phil. Ins. (3d ed.) §§ 1297, 1313.

The case of a ship in immediate danger of capture affords a good illustration of the true distinction.   If the master runs her ashore and thereby saves part of the cargo, or throws overboard part of the cargo and so enables the ship to escape, it is a case of general average.   *Caze* v. *Reilly,* 3 Wash. C. C. 298.   *Barnard* v. *Adams,* 10 How. 270, 304.   So if the master of a ship, after being chased by an enemy who is rapidly gaining on him, at nightfall launches and sets adrift his long boat, fitted with a mast and sail and a lantern at the mast head, and thereby misleads the enemy and escapes. . Emerigon des Assurances, *c.* 12, sect. 41, § 5. 3 Kent Com. (6th ed.) 238 note.   2 Arnould on Ins. (3d ed.) 775.   But, in the absence of any statute or ordinance on the subject, damages incurred, or ammunition expended, by a private armed vessel, in fighting off an enemy, are not subjects of general average.   Emerigon, *c.* 12, sect. 41, § 8.   *Taylor* v. *Curtis* Holt N. P. 192; 4 Camp. 337; 6 Taunt. 608; 2 Marsh. 309.

In all the decisions cited by the learned counsel for the plaintiffs, the peril elected by the master, and by which the injury was done for which contribution was sought, was a different peril from that which threatened the loss of ship and cargo. Most of them were cases of a vessel in imminent danger of foundering, or of being driven on shoals or rocks and thereby going to pieces before reaching the shore, and whose master, having no other means of saving vessel or cargo, ran her, beside or over the shoals or rocks, upon the beach. *Sims* v. *Gurney*, 4 Binn. 124. *Columbian Insurance Co.* v. *Ashby*, 13 Pet. 331. *Barnard* v. *Adams*, 10 How. 270. *Sturgess* v. *Cary*, 2 Curt. C. C. 59. *Rea* v. *Cutler*, 1 Sprague, 135. *Merithew* v. *Sampson*, 4 Allen, 192. In another case, the dangers avoided were those of fire on board and of being driven on a rocky and precipitous shore, the risk voluntarily undertaken by the master was that of running into an unknown bay without a pilot, knowing that stranding was one of the chief risks thereby assumed, and the injury actually suffered was by grounding on an unseen reef at the entrance of the bay. *The Star of Hope*, 9 Wallace, 203. In the remaining case, the ship and cargo, being in danger of sinking in deep water, were run upon the flats and so stranded in shoal water, thereby increasing the peril to the ship, and diminishing the danger to the cargo and the expenses of saving both. *Rathbone* v. *Fowler*, 6 Blatch. C. C. 294, and 12 Wallace, 102.

But it has never, so far as we are informed, been held or suggested, by any court or commentator, and could not be maintained, consistently with sound principles, that where a vessel is in inevitable danger of being thrown upon a particular rock or reef or shoal, and the master, in the exercise of his duty of so managing the vessel as to make the consequent damage to ship and cargo as little as possible, runs the ship upon the same shoal or rock or reef in such a manner as to bring a different part of the vessel in contact with it from that which the mere force of the winds and waves would, he makes a voluntary sacrifice which will found a claim for contribution in general average. If it were so, there could hardly be a case of a shipwreck, in which the master did his duty, and which did not result in a total loss of ship

and cargo, which would not require a general average contribution.

In the present case, taking the allegations in the bill to be true, as we must upon the demurrer, they show that the impending peril was a collision between the plaintiffs' barque and the steamer ; that such collision was inevitable ; that the act voluntarily done by the master of the barque was merely to starboard her helm, an ordinary manœuvre of seamanship ; that its purpose was to diminish the effect of the impending blow ; that by that act the collision was not avoided, but was met as well as might be, and only the position and manner in which the two vessels struck together modified ; and that the damage to the barque, though less than it would have been if her course had not been changed, was all caused by the original peril of collision between the two vessels, and not by any new or different one. The plaintiffs cannot therefore claim a general average of the expenses of repairing the damages thus occasioned to their vessel.

It is no less clear that the sums paid by the plaintiffs under the decree of the Danish court (after putting into Copenhagen for repairs) for a portion of the damage done to the steamer, and the expenses incurred in defending against such proceedings, are not subjects of general average contribution. The Danish court had jurisdiction of the cause and possession of the barque ; the proceedings therein were against the barque alone, and not against her cargo ; and neither the incurring of the expenses of the proceedings, nor the payment of money under the final decree, can be considered as consequences of taking the barque within its jurisdiction, or as resulting from a voluntary sacrifice. The real and legal cause of the liability to pay such damages and expenses was the meeting of the two vessels in collision. *Peters* v. *Warren Insurance Co.* 3 Sumner, 389, 14 Pet. 99, and 1 Story, 463. *Nelson* v. *Suffolk Insurance Co.* 8 Cush. 477. *General Insurance Co* v. *Sherwood*, 14 How. 351. The collision not having been a peril voluntarily incurred, the damages and expenses resulting therefrom were not matters of general average. Story, J., in 3 Sumner, 393, and 1 Story, 468. Phil. Ins. § 1272.

*Demurrer sustained, and bill dismissed.*