## RALLI *v.* TROOP.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 46. Submitted April 27, 1894. — Decided April 1, 1895.

The scuttling of a ship by the municipal authorities of a port, without the direction of her master or other commanding officer, to extinguish a fire in her hold, is not a general average loss.

If the cargo in the hold of a ship moored in a port takes fire, and the port authorities come on board with fire-engines, take charge of her, pump steam and water into the hold, and move her and put her aground, without any objection by the master; and the master successfully removes part of the cargo, and desires, and believes it to be prudent and feasible, to remove more; but the port authorities forbid and prevent his doing so, because of the danger of increasing the fire, and themselves ex-

tinguish the fire by scuttling the ship, whereby she becomes a wreck, not
worth repairing; the loss of the ship is not a subject of contribution in
general average against the owners of the cargo, although the court is
of opinion that the measures taken by the port authorities were the best
available to save the cargo from greater loss.

THIS was a libel in admiralty, filed May 16, 1889, in the
District Court of the United States for the Southern District
of New York, by the charterers against the owners of the
British bark J. W. Parker, of St. John, New Brunswick,
alleging that pursuant to a charter-party, dated October 25,
1885, the libellants on February 16, 1886, loaded on the bark
in the port of Calcutta, to be carried to the port of New York,
at a certain rate of freight, a full cargo, consisting, among
other things, of 7592 bales of jute butts, and received from
her master bills of lading therefor, agreeing to transport the
jute to the port of Boston; that on the same day "fire broke
out, and said bark was thereby so badly damaged as to become
unseaworthy, and her said voyage was thereupon broken up
and abandoned by the respondents;" that afterwards 552
bales of the jute were delivered to the libellants at Boston
from a steamship; that the respondents failed and neglected
to deliver the remaining bales, and by their agent, the master
of the vessel, sold and delivered them at Calcutta, and received
and held the proceeds of the sale, and refused, on demand, to
pay them to the libellants, whereby the libellants were dam-
aged to the amount of $22,000, the value of the undelivered
jute.

The respondents, in their answer, claimed a contribution in
general average. Admitting that the master sold the jute,
and that they received and held the proceeds, they alleged
the following facts: "In accordance with the terms and pro-
visions of the charter-party, a cargo of jute had been laden on
said bark at Calcutta, and on February 18, 1886, said vessel
was ready for sea. Flames broke out in the hold of said bark
about 10 A.M. from causes unknown, but presumably from
spontaneous combustion of the jute in the bales, and said bark
and cargo were in great danger of destruction and of becom-
ing a total loss. Immediately upon discovery of the fire, the

officer in charge of the J. W. Parker sent for the crews of the neighboring vessels to assist, and under his supervision and direction a quantity of water was poured down the forward ventilator and fore hatchway, after which those openings were tightly covered with a sail, and all ventilators closed. Later the engines of the port came to assist, and their hose, charged with fire-extinguishing chemicals, were let into the hold through holes cut in the deck. Other sacrifices and measures were taken against the common danger, which resulted in saving 552 bales of jute uninjured, although the residue of said cargo was so much damaged that the same was condemned and sold. The 552 bales aforesaid were forwarded by steamer to Boston, and there delivered to the libellants."

The respondents further alleged that they executed an average bond; that an adjustment of general average was made, which showed that the proceeds of the sale of cargo at Calcutta amounted to $20,752.83, and that the balance due to the owners of cargo was $7420.48, which they were ready to pay to the libellants, and had deposited in the registry; and denied any other liability to the libellants.

The District Court held that the respondents were entitled to a general average, and confirmed the adjustment, and entered a decree in favor of the libellants for said sum of $7420.48, and interest, for the reasons stated in its opinion in 37 Fed. Rep. 888.

The libellants appealed to the Circuit Court, which made the following findings of facts:

"1. Libellants, who constituted the firm of Ralli Brothers, of New York and Calcutta, on October 25, 1885, chartered the British bark J. W. Parker to load jute and saltpetre for a voyage from Calcutta to New York.

"2. The vessel accordingly proceeded to Calcutta, and, while moored in the river there, was fully laden by libellants with 7592 bales of jute butts and 1062 bags of saltpetre, for which the master signed the usual bills of lading, undertaking to deliver said cargo at Boston.

"3. On the morning of February 18, 1886, a port pilot came on board and took charge of unmooring, preparatory to

taking the bark to sea. All the hatches had been tightly covered the night before. As the anchor chain was hove in, it was necessary for a man to go into the chain locker forward to stow the chain. To reach the locker, the fore hatch had to be opened. Thence one could go through a narrow passage, about three feet wide and three feet high, between the jute bales, to the chain locker, which was about eight feet forward of the hatch. Ernest Edwards, an able seaman, who had been several months on the bark, took a globe lantern, which did not have a lock, but in which the lamp was screwed into the body of the lantern, and, by the mate's orders, went through the fore hatch into the chain locker to stow the chain. This was between 9 and 10 o'clock A.M. A few minutes afterwards, he was heard to scream. At the same time, smoke was seen coming out of the ventilators. The men who tried to rescue him were driven back by the smoke in the fore hatch. Edwards was suffocated. His body was afterwards found in the chain locker.

"4. Thereupon the second officer of the bark caused an alarm to be sounded by ringing the vessel's bell, and from sixty to seventy men from the crews of the neighboring vessels came to his assistance. These men brought buckets with them; water was poured from the buckets into the fore hold. A force-pump on the bark, and another force-pump brought from a ship near by, were both playing large streams of water down the hold. After half an hour of this work, the hatches were covered with wet sails and tarpaulins, but the pumps were kept playing into the chain lockers.

"5. Between 11 and 12 o'clock, and while both force-pumps were still being steadily worked, the port authorities came with fire-engines, and took direction of the vessel; and on the return on board of the master he found the port authorities in charge. The port fire-engines, charged with fire-extinguishing chemicals, were placed through holes cut in the deck. During the night the fire-engines continued pumping in steam; and in the morning the fore hatchway was opened, and six hose were played on the fire in the fore hold, but, as this seemed to increase the fire, the hatches were put on

again. The port authorities then moved the ship, and put her aground. In the forenoon, the captain removed 552 bales of jute from the bark, and desired to remove more; but the port authorities objected, and forbade it, because of the danger of increasing the fire. During that day the port authorities pumped water in the ship; and during the night and following morning the fire was extinguished by the vessel being scuttled. The master believed that it was prudent and feasible to discharge more cargo at the time he was prevented from doing so by the authorities. The measures taken by the mate before the port authorities took charge of the ship, and those subsequently taken by the port authorities, were the best available to extinguish the fire, and to save greater loss upon the cargo.

" 6. The fire was communicated to the said cargo by the lamp carried by the seaman Edwards while on his errand to the chain locker; but whether the occurrence happened by the accidental breaking of the glass of the lantern, or whether by his act in removing the lamp from the lantern, or whether by the lamp becoming unscrewed, or how the occurrence took place, cannot be ascertained. Jute or jute butts in bales is very inflammable cargo, and a lamp or lantern in which the flame is exposed cannot safely or prudently be carried through such a narrow passage as Edwards had to pass. At the time, there was in force a regulation of the port of Calcutta, which had been duly promulgated by the proper authorities, as follows: 'Rule 30. No person shall smoke, or use naked lights of any description, in the hold or between decks of any vessel lying in the port. Closed lanterns, secured by a lock and key, and in charge of an officer of the vessel, shall alone be taken between decks and into the hold.' Neither the master nor the officers of the bark had any notice of this regulation.

" 7. The jute had been packed in the bark's hold as closely as the compressed bales could be forced together by screws. The effect of the water poured on the jute was to expand it, and spring up the decks, break the hatch coamings, and draw out the timbers. The raising of the decks and starting of the beams was observed early in the morning of the day after the

fire. The swelling continued even after a portion of the cargo was removed. The J. W. Parker became a wreck, not worth repairing.

"8. The master, when the port authorities allowed him to resume charge of the vessel, acting for the best interests of all concerned, proceeded to save the residue of the cargo that remained in the vessel. By the outlay of about $8000 for men and lighters, to get the damaged jute out of the bark, and for repacking it in condition for sale, he was able to land the same in godowns or warehouses. He consulted the firm of Turner, Morrison & Co., who were agents of the underwriters on cargo, and followed their directions as to landing the cargo before sale. Surveys were then had, and the cargo was condemned and sold as unfit to go forward, and realized on such sale $20,752.83. The ship was also condemned as unseaworthy, and was sold for 8000 rupees, equal to about $2716.24.

"9. The said master, second officer, and a seaman of said bark, duly made and extended, under oath, a protest against the said fire, and against the said actions of the said port authorities in depriving the master of his said command, and in refusing to permit of the discharge of cargo after it had been commenced, and in causing the said vessel to be stranded or scuttled, and in allowing the tidewater to rise over her deck.

"10. On March 8, 1886, the owners of the bark J. W. Parker offered to turn over all the cargo to the libellants, if they should sign an average bond. This offer was made in New York, and was declined.

"11. The 552 sound bales of jute were transshipped by the captain, and were delivered to libellants' agents at Boston. An average bond was then executed by libellants, by which it was provided that the general average should be adjusted by Jacob R. Telfair, an average adjuster at the port of New York. This was in pursuance of the following clause of the charter-party: 'All questions of average to be settled in accordance with York-Antwerp rules and the established usages and laws of the port of destination, to be stated by average adjusters appointed by charterers' agents and approved by owners.'

"12. On December 7, 1886, a general average adjustment was made up in accordance with the York-Antwerp rules and the usages of said port. The libellants presented to their adjuster various claims for their disbursements, which were allowed as general average, as were also certain disbursements, by the underwriters upon the cargo.

"13. By the adjustment as made up as aforesaid, it was found and stated, after allowing the general average due to the vessel, that the libellants, as owners of the jute, were entitled to an average contribution of $5335, and to the further sum of $1283 for the loss of their saltpetre, together with the sum of $290.51 for advances and profits upon their charter-party, and $227.76 for certain disbursements of Ralli Brothers incurred in connection with said average adjustment. The owners of the vessel were willing to abide by this adjustment, but libellants or their underwriters declined to accept the same.

"14. Some months afterwards this action was begun. The respondents thereupon paid into court the full amount found due to libellants and to their underwriters by said adjustment, and gave security for the residue of libellants' demand.

"15. The District Court having made a decree sustaining said average adjustment, but condemning respondents in interest upon the sum of $5335 as the contribution due for the loss on the jute, also in the sum of $77.89, the amount of the clerk's fees on respondents' deposit, the respondents thereupon paid into that court the further sum of $286.86, making the full amount of the decree of the District Court."

The charter-party and the protest were made parts of the findings of facts. But so much of either as is material to the decision of the case is stated in those findings.

The Circuit Court made the following conclusions of law:

"1. The extinguishing of the fire at Calcutta was a general average act, and the water damage so incurred was a general average sacrifice, for which contribution is due from all interests thereby benefited.

"2. An average bond having been given by the libellants, and the loss being adjudged a proper subject of general average, and no errors being shown in the adjustment, the libellants

are entitled to a decree for the balance stated by the adjustment as aforesaid, and for no more.

"3. The respondents are entitled to their costs in this court."

The decree of the District Court was thereupon affirmed, and, on February 5, 1890, the libellants appealed to this court.

The case was argued here on the 19th and 20th of March, 1894. On the 23d of the following April an order was made restoring it to the docket for reargument; or, if counsel desired, for resubmission on or before April 27, 1894, on the briefs already filed or additional briefs. On that day it was accordingly resubmitted by the same counsel.

*Mr. Sidney Chubb* for appellants.

*Mr. Harrington Putnam* for appellees.

Mr. Justice Gray, after stating the case, delivered the opinion of the court.

The law of general average, coming down to us from remote antiquity, is derived from the law of Rhodes, through the law of Rome, and is part of the maritime law, or law of the sea, as distinguished from the municipal law, or law of the land.

The typical case is that mentioned in the Rhodian law preserved in the Pandects of Justinian, by which, if a jettison of goods is made in order to lighten a ship, what is given for the benefit of all is to be made good by the contribution of all. *Cavetur ut, si levandæ navis gratiâ jactus mercium factus est, omnium contributione sarciatur, quod pro omnibus datum est.* Dig. 14, 2, 1, 1.

Another case of general average, put in the Pandects, and the only one, beside jettison, mentioned in the Judgments of Oleron, or in the Laws of Wisby, is the cutting away of a mast to save ship and cargo. Dig. 14, 2, 1, 4; Oleron, arts. 8, 9; Wisby, arts. 7, 11, 14.

The distinction between voluntary and compulsory sacrifice is well illustrated by another case stated in the Pandects, recognized in the earliest English case on general average,

and approved in all the books, in which money voluntarily paid by the master to ransom the ship and cargo from pirates is to be contributed for; but not so, as to goods or money forcibly taken by pirates. Dig. 14, 2, 1, 5; *Hicks* v. *Palington*, (32 Eliz.) Moore, 297.

In the courts of England and America, general average has not been restricted to the cases put by way of illustration in the Rhodian and Roman laws; but it has never been extended beyond the spirit and principle of those laws.

In the earliest case in this court, Mr. Justice Story, in delivering judgment, stated the leading limitations and conditions, as recognized by all maritime nations, to justify a general contribution, as follows: "First, that the ship and cargo should be placed in a common imminent peril; secondly, that there should be a voluntary sacrifice of property to avert that peril; and, thirdly, that by that sacrifice the safety of the other property should be presently and successfully attained." *Columbian Ins. Co.* v. *Ashby*, 13 Pet. 331, 338.

In the next case which came before this court, Mr. Justice Grier, in delivering judgment, defined these requisites, somewhat more fully, as follows: "In order to constitute a case of general average, three things must concur: 1st. A common danger, a danger in which ship, cargo and crew all participate; a danger imminent and apparently ' inevitable,' except by voluntarily incurring the loss of a portion of the whole to save the remainder. 2d. There must be a voluntary jettison, *jactus*, or casting away of some portion of the joint concern for the purpose of avoiding this imminent peril, *periculi imminentis evitandi causa*, or, in other words, a transfer of the peril from the whole to a particular portion of the whole. 3d. This attempt to avoid the imminent peril must be successful." *Barnard* v. *Adams*, 10 How. 270, 303.

There has been much discussion in the books as to whether the right to a general average contribution rests upon natural justice, or upon an implied contract, or upon a rule of the maritime law, known to and binding upon all owners of ships and cargoes. But the difference has been rather as to forms of expression, than as to substantial principles or legal results.

Mr. Justice Clifford, speaking for this court, stated, in several cases, as the basis of general average, that natural justice requires that where two or more parties are engaged in a common sea risk, and one of them, in a moment of imminent peril, makes a sacrifice to avoid the impending danger, or incurs extraordinary expenses to promote the general safety of the associated interests, the loss or expenses so incurred shall be assessed upon all in proportion to the share of each in the adventure. *McAndrews* v. *Thatcher*, 3 Wall. 348, 366; *The Star of Hope*, 9 Wall. 203, 228; *Fowler* v. *Rathbones*, 12 Wall. 102, 114; *Hobson* v. *Lord*, 92 U. S. 397, 404. That the doctrine applies only where something, which is part of the common adventure, is sacrificed solely for the benefit of the rest of the adventure, is apparent in those cases. In *McAndrews* v. *Thatcher*, it was held that there could be no contribution for expenses incurred after the master had abandoned the stranded ship, and had left her in charge of the agent of her underwriters; because, as the court said : " Complete separation had taken place between the cargo and the ship; and the ship was no longer bound to the cargo, nor the cargo to the ship. Undoubtedly the doctrine of general average contribution is deeply founded in the principles of equity and natural justice; but it is not believed that any decided case can be found, where the liability to such contribution has been pushed to such an extent as that assumed by the plaintiffs." 3 Wall. 372. In *The Star of Hope*, and in *Fowler* v. *Rathbones*, the general average allowed was for the loss of the vessel by stranding by the voluntary act of the master. See *Emery* v. *Huntington*, 109 Mass. 431, 436. And in *Hobson* v. *Lord*, the contribution allowed was for wages and provisions of the crew while assisting in repairing the injuries suffered by the vessel from such a stranding.

In *Wright* v. *Marwood*, in which it was held by the English Court of Appeal that a jettison, by the master, of cattle carried on deck, though proper and necessary for the safety of the ship, did not give a right to general average, Lord Justice Bramwell said: " It is not necessary to say what is the origin or principle of the rule; but, to judge from the way it is

claimed in England, it would seem to arise from an implied contract *inter se* to contribute 'by those interested.'" The judgment, however, was put upon the ground that, whether the rule was treated as arising from implied contract, or as a matter of positive law, it was subject to an exception in the case of goods loaded on deck, unless a deck cargo was customary. 7 Q. B. D. 62, 67.

In *Burton* v. *English*, in the same court, in which the charter-party stipulated that the ship should be "provided with a deck load, if required, at full freight, but at merchant's risk," and the last words were held not to exclude the right to a general average contribution for a necessary jettison of timber carried on deck, Lord Justice Brett, (since Lord Esher, Master of the Rolls,) in answering the question, "By what law does the right arise to general average contribution?" said: "I do not think that it forms any part of the contract to carry ; and that it does not arise from any contract at all, but from the old Rhodian laws, and has become incorporated into the law of England as the law of the ocean. It is not as a matter of contract, but in consequence of a common danger, where natural justice requires that all should contribute to indemnify for the loss of property which is sacrificed by one in order that the whole adventure may be saved. If this be so, the liability to contribute does not arise out of any contract at all, and is not covered by the stipulation in the charter-party on which the defendants rely." 12 Q. B. D. 218, 220, 221.

In the same case, Lord Justice Bowen, with characteristic clearness and felicity of expression, said of the same question: "In the investigation of legal principles, the question whether they arise by way of implied contract or not often ends by being a mere question of words. General average contribution is a principle which comes down to us from an anterior period of our history, and from the law of commerce and the sea. When, however, it is once established as part of the law, and as a portion of the risks which those who embark their property upon ships are willing to take, you may, if you like, imagine that those who place their property on board a ship on the one side, and the shipowner who puts his ship by the quay to receive

the cargo on the other side, bind themselves by an implied contract which embodies this principle, just as it may be said that those who contract with reference to a custom impliedly make it a portion of the contract. But that way, although legally it may be a sound way, nevertheless is a technical way of looking at it. This claim for average contribution, at all events, is part of the law of the sea, and it certainly arises in consequence of an act done by the captain as agent, not for the shipowner alone, but also for the cargo owner, by which act he jettisons part of the cargo on the implied basis that contribution will be made by the ship and by the other owners of cargo. He makes the sacrifice on behalf of one principal, whose agent of necessity he is, on the implied terms, if you like to call it so, that that principal shall be indemnified afterwards by the rest." 12 Q. B. D. 223.

As the right to general average may be considered as resting not merely on implied contract between the parties to the common adventure, but rather on the established law of the sea, in the light of and subject to which all owners of ships and cargoes undertake maritime adventures, so the authority of the master may be treated as resting either on implied contract of the parties, or on the duty imposed upon him by the law, as incident to his station and office, to meet the necessity created by an emergency which could not be foreseen or provided for, and to prevent the property in his custody and control from being left without protection and care.

Sir William Scott, speaking of the powers and duties of the master, said: "Though in the ordinary state of things he is a stranger to the cargo, beyond the purposes of safe custody and conveyance, yet in cases of instant and unforeseen and unprovided necessity, the character of agent and supercargo is forced upon him, not by the immediate act and appointment of the owner, but by the general policy of the law; unless the law can be supposed to mean that valuable property in his hand is to be left without protection and care. It must unavoidably be admitted, that in some cases he must exercise the discretion of an authorized agent over the cargo, as well in the prosecution of the voyage at sea, as in intermediate

ports, into which he may be compelled to enter." He illustrated this by the case of jettison to be contributed for in general average, by the case of ransom, and by the case of sale of perishable cargo in a port of necessity, and added: "In all these cases, the character of agent respecting the cargo is thrown upon the master, by the policy of the law, acting on the necessity of the circumstances in which he is placed." *The Gratitudine*, 3 C. Rob. 240, 257, 258, 260.

In the case of *The Hornet*, reported as *Lawrence* v. *Minturn*, 17 How. 100, in which the question was whether a certain jettison of goods was lawful as against their owner, Mr. Justice Curtis, delivering the judgment of this court, spoke of the authority of the master in the threefold aspect, as " imposed on him by the nature of the case," as "derived from the implied consent of all concerned in the common adventure," and as "intrusted to him by the law," saying: " The nature of the case imposes on the master the duty, and clothes him with the power, to judge and determine, upon the facts before him, whether a jettison be necessary. He derives this authority from the implied consent of all concerned in the common adventure. The obligation of the owners is to appoint a competent master, having reasonable skill and judgment and courage; and they are liable, if through his failure to possess or exert these qualities, in any emergency, the interest of the shippers is prejudiced. But they do not contract for his infallibility, nor that he shall do, in an emergency, precisely what, after the event, others may think would have been best. If he was a competent master; if an emergency actually existed, calling for a decision, whether to make a jettison of a part of the cargo; if he appears to have arrived at his decision with due deliberation, by a fair exercise of his skill and discretion, with no unreasonable timidity, and with an honest intent to do his duty, the jettison is lawful. It will be deemed to have been necessary for the common safety, because the person, to whom the law has intrusted authority to decide upon and make it, has duly exercised that authority." 17 How. 100, 109, 110. See also *Dupont* v. *Vance*, 19 How. 162, 166, 170.

In former times, when merchants voyaged with their wares, their consent was held necessary to a jettison ; and the captain was also required to consult with his officers, or with some of his crew, then, perhaps, more nearly his equals than in later times. But, even then, the final decision rested with the captain ; for, as Emerigon said, "The captain is master. He is obliged to take advice ; but the law does not oblige him to submit himself blindly to that advice, if it is bad, or if, under the circumstances, it appears to be bad." Emerigon on Ins., c. 12, sect. 4, § 3 ; sect. 40, § 3 ; *The Nimrod*, 1 Ware, 1, 13–15.

At the present day, since voyages are longer, and merchants seldom go with their goods, there is the greater reason that upon the captain, selected for his skill and courage, and for his fitness to command the whole adventure, and to decide promptly and justly in cases of emergency, and better acquainted than any one else with the qualities and condition of the ship, and with the nature and stowage of her cargo, should rest the authority and the duty, in case of imminent peril, first taking such advice as he sees fit, to determine finally, so far as concerns the mutual relations of those interested in the maritime adventure, the time and the manner of sacrificing part of the adventure to secure the safety of the rest.

In the leading case of *Columbian Ins. Co.* v. *Ashby*, already cited, this court, speaking by Mr. Justice Story, said : " A consultation with the officers may be highly proper, in cases which admit of delay and deliberation, to repel the imputation of rashness and unnecessary stranding by the master. But if the propriety and necessity of the act are otherwise sufficiently made out, there is an end of the substance of the objection. Indeed, in many, if not most, of, the acts done on these melancholy occasions, there is little time for deliberation or consultation. What is to be done must often, in order to be successful, be done promptly and instantly by the master, upon his own judgment and responsibility." 13 Pet. 343, 344.

In *The Star of Hope*, already cited, this court said : " From

the necessity of the case, the law imposes·upon the master· the duty, and clothes him with the power, to judge and determine at the time whether the circumstances of danger in such a case are or are not so great and pressing as to render a sacrifice of a portion of the associated interests indispensable for the common safety of the remainder. Standing upon the deck of the vessel, with a full knowledge of her strength and condition, and of the state of the elements which threaten a common destruction, he can best decide in the emergency what the necessities of the moment require to save the lives of those on board and the property intrusted his care." 9 Wall. 230, 231.

If the master does not exercise reasonable skill and judgment and courage in sacrificing goods for the benefit of the adventure, the master and the owner of the ship are each liable to the owner of the goods sacrificed. *Barnard* v. *Adams*, 10 How. 270, 304 ; *Lawrence* v. *Minturn*, 17 How. 100, 110, above quoted.

After a voluntary sacrifice of part of the adventure, and a consequent escape of the rest from imminent peril, the owner of the ship, or in his absence the master as his agent, has the duty of having an adjustment made of the general average, and has a maritime lien on the interests saved, and remaining in his possession, for the amount due in contribution to the owner of the ship ; and the owner of goods sacrificed has a corresponding lien on what is saved, for the amount due to him. *Cutler* v. *Rae*, 7 How. 729, 731, 732 ; *Dupont* v. *Vance*, 19 How. 162, 168–171 ; *Strang* v. *Scott*, 14 App. Cas. 601, 606, 607 ; 3 Kent Com. 244.

Whether the master is considered as acting under an implied contract between the owners of the vessel and the shippers of the cargo, or as the agent of all from the necessity of the case, or as exercising a power and duty imposed upon him by the law as incident to his office — whatever may be˙ considered the source of his authority — the power and the duty of determining what part of the common adventure shall be sacrificed for the safety of the rest, and when and how the sacrifice shall be made, appertain to the master of the vessel,

*magister navis*, as the person intrusted with the command and the safety of the common adventure, and of all the interests comprised therein, for the benefit of all concerned, or to some one who, by the maritime law, acts under him, or succeeds to his authority.

In case of the master's death, disability or absence, no doubt, the mate or other chief officer of the vessel may succeed to the authority of the master, in this as in other respects. *The Ann C. Pratt*, 10 N. Y. Leg. Obs. 193; 1 Curtis, 340, and 18 How. 63.

In *Price* v. *Noble*, 4 Taunt. 123, in which a necessary jettison, made after a privateer had captured the ship, had taken out her captain and crew, except the mate and two men, and had put a prize master and crew on board, was held (the ship having been recaptured by the mate, and carried into a British port) to be a ground for contribution in general average, the jettison was made, as the report states, "with the assistance and approbation of the mate;" and the prize master and crew, as the court noted, "had so much better an opinion of the judgment of the mate, than of their own, that they consulted him and intrusted him with the navigation, and the stores seem to have been thrown over by his own individual direction." And Lord Tenterden so understood that case, saying that it was there decided "that the shippers of goods were liable to contribution for stores necessarily and by the advice of the mate thrown overboard, after the ship was captured, and while in possession of the enemy; for the capture, without condemnation, did not devest the property of the owners while a *spes recuperandi* remained." Abbott on Shipping, (11th ed.) 528.

A German commentator has suggested that, if a peril should be encountered while a pilot has command of the vessel, a case may be supposed in which the pilot might order a sacrifice in contradiction to the master, without depriving the sacrifice of the character of a general average loss. Ulrich, Haverei Gesetze, 6. But no judicial decision has been found, which recognizes a right in the pilot to make a jettison or other sacrifice. The reason for requiring a vessel to take a

pilot is his familiar acquaintance with particular waters. " His duty," said Mr. Justice Story, speaking for this court, " is properly the duty to navigate the ship over and through his pilotage limits, or, as it is commonly called, his pilotage ground." *The Hope*, 10 Pet. 108, 123. To the pilot, there-fore, temporarily belongs the whole conduct of the navigation of the ship, including the duty of determining her course and speed, and the time, place and manner of anchoring her. *Cooley* v. *Board of Wardens*, 12 How. 299, 316; *The Chris-tiana*, 7 Moore P. C. 160, 171; *The City of Cambridge*, L. R. 5 P. C. 451. But the master still has the duty of seeing to the safety of the ship, and to the proper stowage of the cargo. For instance, the duty to keep a good lookout rests upon the master and crew. *The Iona*, L. R. 1 P. C. 426. And it has been held by Dr. Lushington, in the English High Court of Admiralty, that, although a pilot is in charge, the trim of the ship is within the province of the master; *The Argo*, Swabey, 462 ; as well as the duty, if two vessels are entangled together, to cut away part of the rigging of his vessel, when necessary, in order to avoid a collision, or to lessen its effect ; because the vessel, the judge said, " was not under the orders of the pilot for this purpose; she was only under the pilot's directions for the purpose of navigation ; and the master, in a case of this description, is not to wait for the pilot's directions, which would tend to create great confusion and delay." *The Massa-chusetts*, 1 W. Rob. 371, 373. Rigging so cut away by the master would seem to be a subject of general average, as be-tween the vessel and her cargo. Lowndes on Average, (4th ed.) 109, 110; 1 Parsons on Shipping, 351.

The authority of the pilot, as regards general average, was not touched by the decision of this court in *The China*, 7 Wall. 53, by which a vessel, in charge of a pilot whom she had been compelled by law to take on board, and brought by his negligence into collision with another vessel, was held, upon a libel *in rem*, to be liable in damages to the owners of that vessel. That decision proceeded, not upon any authority or agency of the pilot, derived from the civil law of master and servant, or from the common law, as the representative of

the owners of the ship and cargo; nor upon the law of contribution in general average as between them; but upon a distinct principle of the maritime law, namely, that the vessel, in whosesoever hands she lawfully is, is herself considered as the wrongdoer, liable for the tort, and subject to a maritime lien for the damages. 7 Wall. 68. As said by Mr. Evarts, in his argument for the libellants, "This theory treats the faults of conduct in the vessel's navigation as imputable to the vessel itself, and discards as immaterial all considerations touching the *adjustment* among the navigators, or between them and the owners, of the personal fault or personal responsibility of the misgovernment of the vessel." 7 Wall. 56. And, as observed by this court, in another case decided at the same term, cases of general average " certainly are not cases of tort." *The Eagle*, 8 Wall. 15, 23. It is worthy of notice, also, that the responsibility of the vessel 'for torts does not include her cargo. *The Malek Adhel*, 2 How. 210, 235–237; *The Victor*, Lushington, 72; *The Flora*, L. R. 1 Ad. & Ec. 45, 48.

But if a general average loss could be held to arise from an act of a pilot, without or against the order of the master of the vessel, it could only be because the pilot, by the maritime law, and by reason of his nautical skill and experience, temporarily took the place of the master, and was specially charged with the command and the safety of the whole maritime adventure, and of that adventure only. However it might be with a pilot, there is no case, in England or America, before the one at bar, in which a sacrifice made by a stranger, in no way connected with the navigation of the ship, or with the control or the care of the ship and cargo, as a distinct maritime adventure, has been held to give a right to contribution in general average.

There can be no general average, unless there has been a voluntary and successful sacrifice of part of the maritime adventure, made for the benefit of the whole adventure, and for no other purpose, and by order of the owners of all the interests included in the common adventure, or the authorized representative of all of them. The safety of any property, on land or water, not included in that adventure, can neither

be an object of the sacrifice, nor a subject of the contribution.

·For example, from early times and in all countries, the master has been required, upon arrival of the ship in port, to make, with some of the crew, a protest, upon oath, that the jettison was made for the safety of the ship and lading, and for no other cause.   Oleron, art. 8 ; Wisby, art. 20 ; 1 Malyne, (3d ed.) 113 ; Beàwes, (4th ed.) 148 ; 2 Molloy, c. 6, § 2 ; Marsh. Ins. (5th ed.) 433 ; Abbott on Shipping, (11th ed.) 526.

The first edition of Arnould on Marine Insurance, indeed — substantially following 2 Phillips on Insurance, c. 15, sec. 2, (2d ed.) 96 — contained this paragraph : " If, with a view to the general safety of ship and cargo, it becomes necessary to damage and destroy another ship, or any part thereof, the loss thereby incurred must, it seems, be made good by a general average contribution.   Thus, if a number of ships are lashed together and one takes fire, and the crews of the others unite in scuttling the burning ship for the safety of the rest, the loss of the ship so sunk is said to be a general average loss, to which all those saved thereby must contribute ; and the law is the same if a crew, for the safety of their own ship, cut the cable of another."   2 Arnould on Ins., pt. 3, c. 4, (1st ed.) 895, 896.   This is not laid down absolutely, but only as " it seems," and " is said."

The authorities there cited, as to contribution for one ship taking fire and scuttled to save neighboring ships, are Casaregis, disc. 46, no. 45 ; Ordinance of Bilbao, c. 20, art. 21 ; and 2 Azuni on Maritime Law, c. 3, art. 2.   Casaregis states the point as a doubtful one, and the authorities to which he refers are conflicting, and more or less influenced by local law or custom. The Ordinance of Bilbao was a peculiar and local ordinance, apparently not in accord with the general law of Spain.   2 Magens, 400 ; Stevens and Benecke on Average, (Amer. ed.) 166 ; Gregorio Lopez, ad Partidas, pt. 7, tit. 15, 1. 12, note 2. And Azuni, speaking by way of illustration only, treats the right to destroy, and the duty to make contribution, as alike in the cases of a burning ship on the sea, and of a burning house upon land.

But the law of general average, in England and America, is limited to property included in a maritime adventure; and has no application to other property, on land, or to contracts relating to such property. In *Welles* v. *Boston Ins. Co.*, 6 Pick. 182, sometimes cited as a judicial application of general average to insurance of buildings or their contents against fire, there was nothing of the kind. That was an action on a policy of insurance against fire on a stock of goods, the owners of which, upon the breaking out of a fire in the neighborhood, and with the consent of the insurance company, and in order to save the goods and the building containing them, procured blankets, wet them, and spread them on the outside of the building, whereby the building and goods were saved, and the blankets rendered worthless. The insurance company having admitted its liability for such proportion of the value of the blankets as the amount of its insurance on the plaintiffs' goods bore to the whole value of their goods and building, the court had no occasion to pass and did not pass upon that, saying only that, for a proportion of the sacrifice made by the plaintiffs, "they are equitably, if not legally, entitled to recover." The only claim in controversy was the claim of the plaintiffs to recover the whole value of the blankets, or at least to a contribution from neighboring buildings insured by the same company; and this claim was disallowed by the court.

By our law, indeed, either public officers or private persons may raze houses to prevent the spreading of a conflagration. But this right rests on public necessity, and no one is bound to compensate for or to contribute to the loss, unless the town or neighborhood is made liable by express statute. 2 Kent Com. 338, 339; *Bowditch* v. *Boston*, 101 U. S. 16; *Taylor* v. *Plymouth*, 8 Met. 462; *The John Perkins*, 21 Law Reporter, 87, 97; *The James P. Donaldson*, 19 Fed. Rep. 264, 269. Another instance of a right founded on necessity is the case of *The Gravesend Barge*, or *Mouse's case*, decided and reported by Lord Coke, in which it was held that in a tempest, and to save the lives of the passengers, a passenger might cast out ponderous and valuable goods, without making himself

liable to an action by their owner.   12 Rep. 63 ; *S. C.* 1 Rol.
R. 79 ; 2 Bulstr. 280.

The suggestion of Arnould, in the passage above cited, that
a ship, whose crew, for her safety, cut the cable of another
ship, must contribute in general average for the value of the
cable, is directly contrary to the opinion of Labeo, preserved
in the Pandects, and approved by Emerigon.   *Labeo scribit,
si cum vi ventorum navis impulsa esset in funes anchorarum
alterius, et nautæ funes præcidissent, si nullo alio modo, nisi
præcisis funibus, explicare se potuit, nullam actionem dandam.*
Dig. 9, 2, 29, 3 ; Emerigon on Ins., c. 12, sect. 14, § 5.

In the case of a collision between two vessels, by the fault
of both, the maritime law everywhere, by what has been
called *rusticum judicium,* apportions equally between both
vessels the damages done to both.   *The Catharine,* 17 How.
170 ; *The North Star,* 106 U. S. 17 ; *The Max Morris,* 137
U. S. 1.   But if the collision, without fault on the part of
either vessel, is caused by inevitable accident, as by the one
being driven by a storm against the other, then, although by
the law of some European countries the loss is apportioned,
yet by our law, as by the laws of Rome and of England, each
vessel must bear her own loss, and, as said by Mr. Justice
Story, " it is not the subject of apportionment, or contribution,
or of general average in any form."   *Peters* v. *Warren Ins.
Co.,* 3 Sumner, 389, 394 ; *The Washington,* 14 How. 532,
538 ; *The John Fraser,* 21 How. 184, 194.

In the later editions of Arnould, by Machlachlan, the para-
graph above quoted has been doubtingly retained, and finally
omitted, and the following propositions laid down : " The
singular law relating to this subject, adopted and observed
by all the maritime peoples of Europe, and now also of Amer-
ica," " is unknown to us, except in connection with seafaring
adventure."   " When the danger is of a total loss of the com-
mon adventure, so imminent and conclusive as in the view of
a judicious and skilled mariner to admit of but one alternative,
and that the alternative of a sacrifice, say of part of the
whole, the making of such sacrifice is justified in fact, becomes
a duty of the master as agent of all, and is a general average

act in law." " In order to its being a general average act, it must have been done for the common adventure." 2 Arnould on Ins., pt. 3, c. 4, (3d ed.) 782; (5th ed.) 813,.814, 820, 832.

Mr. Justice Shee, in a note to Abbott on Shipping, after reviewing the statements of many continental writers upon the subject, concludes : " Upon the whole, it is impossible, consistently with the opinion of Lord Tenterden, and with the doctrine of all the writers on maritime law, whose opinions, have not been warped by the exceptional legislation or practice of the countries in which they have written, to recognize a rule respecting ship's expenses more comprehensive than the following one.: Expenses voluntarily and successfully incurred, or the necessary consequences of resolutions voluntarily and successfully taken, by a person in charge of a sea adventure, for the safety of life, ship and cargo, under the pressure of a danger of total loss or destruction imminent and common to them, give, the ship being saved, a claim to general average contribution." Abbott on Shipping, (11th ed.) 537, note. In *Harrison* v. *Bank of Australasia*, L. R. 7 Ex. 39, 48, that statement was quoted as laying down the true rule, although there was a difference of opinion as to whether the facts of the case came within it. See also *Robinson* .v. *Price*, 2 Q. B. D. 91, 94, 295.

The general maritime law is in force in this country, so far only as it has been adopted by our own laws and usages. *The Lottawanna*, 21 Wall. 558, 572 ; *The Scotland*, 105 U. S. 24, 29 ; *Liverpool Steam Co.* v. *Phenix Ins. Co.*, 129 U. S. 397, 444.

Three important decisions in the courts of the United States directly support the position that, in order to give a right to contribution in general average, the sacrifice must have been made for the safety of the common adventure, and for no other purpose. *The Mary*, 1 Sprague, 17 ; *The John Perkins*, 3. Ware, 89, and 21 Law Reporter, 87 ; *The James P. Donaldson*, 19 Fed. Rep. 264, and 21 Fed. Rep. 671.

In *The Mary*, in the District Court of the United States for the District of Massachusetts, Judge Sprague, a most eminent admiralty judge, held that a voluntary sacrifice, made for the

general benefit of the whole adventure, and also for the particular benefit of the cargo, was not a subject of general average. 1 Sprague, 19.

In *The John Perkins*, in the District of Massachusetts, two schooners, the John Perkins and the Wyvern, having accidentally been enclosed in a large and dangerous field of ice, and being in great peril, and the crews of both vessels having left them and escaped to the shore, except one Nickerson, who remained on board the Wyvern, which was at anchor, he, perceiving the John Perkins drifting towards the Wyvern, and to prevent a collision, cut the Wyvern's cable, and thus prevented the destruction of both vessels; and a libel was filed by him, and by the master, in behalf of the owners, officers and crew of the Wyvern, claiming salvage, and also damages, or else a contribution in general average, for the loss of her cable and anchor. Judge Ware in the District Court, and Mr. Justice Curtis in the Circuit Court on appeal, both held that neither the claim of salvage nor that of general average could be sustained; and Mr. Justice Curtis, reversing in this respect only the decision of Judge Ware, held that there could be no recovery in damages for the value of the cable and anchor. 3 Ware, 89; 21 Law Reporter, 87.

Mr. Justice Curtis declared that the right of contribution in general average had never been, so far as he was aware, and could not be, extended beyond those who had voluntarily embarked in a common adventure; and therefore decided that the cutting of the cable of the one vessel by her crew, to avoid or escape an apprehended collision with the other vessel, made no case for contribution in general average. After saying, "It is certainly true that such a claim, when viewed theoretically, has an equity very similar to, if not identical with, that on which the famous Rhodian law was founded, and out of which the more modern doctrines of the law of general average have grown," he added, "At the same time, it is quite clear that the Roman law never applied the principle between mere strangers," and cited the opinions of Labeo and of Emerigon, above referred to, as being upon "the precise case under consideration, except that the cable is cut by the mari-

ners of the other vessel, which can scarcely weaken the claim."
He further observed that in *Dupont* v. *Vance,* 19 How. 162, as
well as in *Lawrence* v. *Minturn,* 17 How. 100, both, cited
above, this court ".considered that the master, in case of neces-
sary voluntary sacrifice to escape peril, was acting as the
authorized agent of all concerned in the common adventure,
and so bound all by his act, a principle which could hardly
apply between mere strangers." After referring to other
authorities, he said that in *Sturgis* v. *Cary,* 2 Curtis, 382, 384,
he had declared that he did not consider the right to recover
a general average contribution as arising from a contract, but
from "a principle of natural justice, that they who have re-
ceived a common benefit from a sacrifice voluntarily made by
one engaged in a common adventure, should unite to make
good the loss which that sacrifice occasioned ; " and concluded
as follows: " But I never entertained a doubt, that from
the relation of the parties to a common adventure, the law
would imply a contract for the purpose of a remedy ; nor did
I then suppose that it would be implied between strangers,
who were not united in a common adventure by one or more
contracts of affreightment. The ancient as well as the mod-
ern codes of sea laws proceed upon the assumption that the
master, representing all the aggregate interests by holding
that office, has the rightful power to judge upon the sacrifice
of one of the interests which he thus represents, for the bene-
fit of the others. But they afford no ground for the position
that he may judge and act for mere strangers, whose property
has not been confided to his care. In my opinion, the only sub-
jects bound to make contribution are those which are united
together in a common adventure, and placed under the charge
of the master of the vessel, with the authority to act in emer-
gencies as the agent of all concerned, and which are relieved
from a common peril by a voluntary sacrifice made of one of
those subjects. Consequently, I must reject the claim for gen-
eral average." 21 Law Reporter, 97, 98.

That judgment of Mr. Justice Curtis clearly shows that
in his opinion there could be no general average, except upon
a voluntary sacrifice of part of the common adventure, for

the benefit of the adventure alone, and made by the owners of the interests engaged in that adventure, or by the master representing them all; and therefore the cutting of the cable of one vessel to avoid an impending collision with another vessel driven by a storm, would not be a subject of contribution between the two vessels, whether the cable was cut by the vessel to which it belonged, or by the other vessel.

In *The James P. Donaldson*, in the Eastern District of Michigan, Mr. Justice Brown, then District Judge, and Mr. Justice Matthews, each fully approved and strongly relied on that judgment, and on the principle which governed it, although they differed as to the application of the principle to a claim of general average against a tug for the abandonment of her tow of barges, with the intention, and with the effect, of losing the tow and saving the tug.

In the District Court, Judge Brown said: " It is true there are in this case many of the elements which go to entitle the barges to a general average contribution, as stated in the leading case of *Barnard* v. *Adams*, 10 How. 270; still I know of no case wherein the principle of mutual contribution has been extended beyond the ship, her boats, tackle, apparel, furniture, and cargo. I understand the law of general average to be an outgrowth of the law maritime as applied to the carriage of goods by sea. It is never applied to cases of a voluntary sacrifice of property upon land, when made to preserve the property of others from a greater loss." " Indeed, the cases have gone so far as to hold that the parties themselves who commit an act of depredation for the public safety are not liable in trespass." After referring to a number of authorities, he stated his conclusions as follows: " From this review of authorities, it is quite apparent that the doctrine of general average contribution arises from the peculiar relations existing between the ship and her cargo." " The law of general average is confined to those cases wherein a voluntary sacrifice is made of some portion of the ship or cargo for the benefit of the residue, and it has no application to a contract of towage." 19 Fed. Rep. 269, 270, 272.

In the Circuit Court, on appeal, Mr. Justice Matthews,

after citing the passage, above quoted, from the first edition of Arnould on Insurance, said that "it must be admitted that no judicial precedent to that effect has been found in the decisions of either English or American courts; and that the case, as put, lacks the necessary element of a common interest, united by consent of several owners, delivered by the authorized act of a common agent, from an imminent peril threatening the whole, by the voluntary sacrifice of a part." And he reversed the decision of the District Court solely because, as he thought, the tug and the barges were not strangers to each other, but by the contract of towage were bound together and interested in a common adventure, and the master of the tug had charge of the navigation of the whole tow for the voyage and for the purposes of that navigation, and, to meet its exigencies, was invested with authority to act for all. 21 Fed. Rep. 676, 678.

This summary of the grounds of the two opinions delivered in *The James P. Donaldson* sufficiently shows that both proceeded upon the fundamental principle in general average, that the sacrifice must be made solely for the benefit of the common adventure, and that the interests of strangers to that adventure neither contribute nor are contributed for.

Doubtless, acts necessary to save the common adventure from an impending peril, or from its consequences, may either be done by the master and crew themselves; or else the master of the ship, or the owner, if present, may, in a proper case, avail himself of the aid of other private persons, or of public authorities, and necessary and reasonable expenses paid for such aid may be a subject of contribution in general average. *The Star of Hope*, 9 Wall. 203, 227, 234; *Gage* v. *Libby*, 14 Allen, 261, 269; *Rose* v. *Bank of Australasia*, (1894) App. Cas. 687.

In this country, when a ship is on fire, damage caused to goods in the hold by water, either poured down from above, or let in by scuttling the ship, by the master, or under his order and direction, for the purpose of saving ship and cargo, has long been considered a subject of general average. *Columbian Ins. Co.* v. *Ashby*, 13 Pet. 331, 340; 1 Parsons on

Shipping, 365; and many cases cited below. In such a case, at one time, the practice of English adjusters was to allow only the damage done to the ship by cutting holes in her to admit the water, but not the damage done by the water to the ship or cargo. Lowndes on Average, (4th ed.) 68. But that practice was changed, in deference to the opinion of the Court of Queen's Bench, (although any expression of opinion upon the point was avoided in the Exchequer Chamber,) in *Stewart* v. *West India Co.*, (1873) L. R. 8 Q. B. 88, 362. And the law of England in that respect has since been settled in accordance with our law. *Whitecross Co.* v. *Savill*, (1882) 8 Q. B. D. 653.

By Rule 3 of the York-Antwerp Rules of 1877, adopted while the law of England upon that question was unsettled, and referred to in the charter-party of the J. W. Parker, "damage done to a ship and cargo, or either of them, by water or otherwise, in extinguishing a fire on board the ship, shall be general average; except that no compensation be made for damage done by water to packages which had been on fire." All those rules, like the Glasgow Resolutions of 1860, and the York Rules of 1864, relate only to the subjects of contribution in general average, and do not touch the question by whom the voluntary sacrifice must be made. Lowndes on Average, (4th ed.) appx. U.

The Resolutions of the International Congress at Brussels, in 1888, while they likewise include, among the things considered as subjects of general average, "damage caused to the ship, and to the goods not injured by the fire, as the result of extinguishing a fire taking place on board," lay down, in the first article, as the leading principle of general average, *Les avaries communes sont les dépenses extraordinaires et les sacrifices faits volontairement par le capitaine ou d'après ses ordres, pour le bien et le salut commun du navire et du chargement —* which may be rendered in English : "General average is an extraordinary expenditure or a sacrifice voluntarily made by the captain or pursuant to his orders, for the common good and safety of the ship and cargo." Actes du Congrès International de Droit Commercial de Bruxelles, (1888) pp. 418, 419.

In none of the cases cited by the appellees, was property, sacrificed to put out a fire, by direction of others than the master or mate of a ship, adjudged to be a general average loss.

In *Nimick* v. *Holmes*, 25 Penn. St. 366; in which a fire had broken out on a steamboat lying at a wharf, it was by direction of her officers, that steam and water were poured into the hold by means of her own apparatus and hose, and that she was afterwards scuttled. In *Heye* v. *North German Lloyd*, 33 Fed. Rep. 60, and 36 Fed. Rep. 705, also, the fire was extinguished by the officers and crew only. In *Gregory* v. *Orrall*, 8 Fed. Rep. 287, the floating fire-engines used in putting out the fire were apparently employed by the master and under his control. In *Nelson* v. *Belmont*, 5 Duer, 310, 322, and 21 N. Y. 36, the fire-engine companies were hired by the master of the ship, and the question controverted was whether a valuable part of the cargo, previously put by him on board another vessel, was liable to contribute.

In *The Roanoke*, 46 Fed. Rep. 297; and 53 Fed. Rep. 270, in the District Court of the United States for the Eastern District of Wisconsin, although the fire department took part in extinguishing the fire, everything was done by the direction and with the approval of the master. Judge Jenkins, in overruling exceptions to the libel, said : " It was a selection by the master for sacrifice of that which by the act must necessarily be destroyed." " The master must be presumed to have designed the consequences necessarily resulting from the act directed." " The objection that the act was that of the municipal authorities, without direction or concurrence on the part of the master, is ill sustained in point of fact. The protest discloses that the alarm was given, and the fire department called into action, by the master of the vessel. The action of the firemen was therefore by his procurement. Subsequent flooding was the direct act of master and crew." 46 Fed. Rep. 299, 300. And his decision on the merits was based upon this postulate : " The master is made the agent, in the law, of the vessel, of the cargo, of the parties owning the cargo and owning the vessel, and given the discretion in

time of emergency to subject the one to loss for the preservation of the other." 53 Fed. Rep. 271. His opinion was approved and adopted by the Circuit Court of Appeals, without further discussion of the question. 18 U. S. App. 407. The opinion of Judge Hanford in *The Rapid Transit*, 52 Fed. Rep. 320, contains only a very brief and general statement of facts, and is rested on the authority of the first opinion of Judge Jenkins in *The Roanoke*.

In *Whitecross Co.* v. *Savill*, 8 Q. B. D. 653, in the English Court of Appeal, a fire which had broken out in the hold of a ship, while she was lying at a wharf in her port of destination, was extinguished by pouring water into the hold, pursuant to the orders of the master, and it was the consequent damage to the cargo from his act that was held to be a general average loss. Lord Coleridge said : " It must be shown that an imminent peril existed, and that the master, deliberately and for the sake of preserving the adventure, sacrificed that in respect of which contribution is claimed." 8 Q. B. D. 659. And Lord Justice Brett said: "If there is an imminent danger, and if the captain sacrifices part in order to save the rest of the adventure, a claim for a general average contribution arises." "It has been said that the defendant's vessel might have been scuttled; but the expense of raising and repairing her would have entitled her owners to a general average contribution; and because an apparently alternative mode of proceeding existed, the captain cannot be said to have acted unreasonably." 8 Q. B. D. 662, 663.

The members of a fire department, or other persons, under the command of municipal officers of a port, and not under the employment and direction of the master of the ship, are simply executing a public duty, and are not acting, by any implication of contract or of law, for or in behalf of the owners of the ship and cargo. *The Mary Frost*, 2 Woods, 306 ; *The Cherokee*, 31 Fed. Rep. 167, 170 ; *Wamsutta Mills* v. *Old Colony Steamboat Co.*, 137 Mass. 471.

Considering how ancient and universal is the law of general average, how frequent the occasions for invoking it under every variety of circumstances, and how diverse the opinions

which have been expressed in regard to its application and extent, it is significant that the learned arguments of counsel, supplemented by further researches, have disclosed no commercial code, no opinion of a commentator, and no judicial decision, supporting a claim to contribution in general average for the destruction of ship or cargo by the municipal authorities of a port, without the direction of the master or other commanding officer of the ship. That being so, it is difficult to see how the parties to a maritime adventure can be considered either to have contracted to contribute to such a loss, or to be subjected by the law, without their consent, to the duty of so contributing.

The first and only case, so far as we are aware, in which a claim of general average was ever made, in any court, for the destruction of vessel or cargo by act of the municipal authorities of a port, without the order or concurrence of the master or commanding officer of the vessel, was in the Supreme Judicial Court of Massachusetts, in *Wamsutta Mills* v. *Old Colony Steamboat Co.*, (1884) 137 Mass. 471. In that case, a steamship with her cargo having just arrived in the port of New Bedford, and lying at a wharf near other vessels and near buildings, a fire broke out in her hold. The chief engineer of the fire department of the city went to the vessel with firemen and fire-engines, and, acting entirely on his own judgment, without any orders or directions from, or conference with, the officer in charge of the vessel, ordered holes to be cut in her, through which water was poured by the engine into the hold until the vessel sank. The mate and crew were present, but rendered no assistance in extinguishing the fire; and no objection to the use of the water was made by the mate, or by the master, when he arrived. What was done was necessary to extinguish the fire, which, if allowed to burn, would have spread to the neighboring vessels and buildings. A claim of general average was made against the owner of the steamship by an owner of cotton on board, damaged by the water poured into the ship by the fire department.

The court, speaking by Mr. Justice Field, since Chief Justice of Massachusetts, admitted that, "although the steamship

was at her wharf, the maritime adventure was not at an end; the ship was still bound to the cargo for its safe delivery; and the cotton, on account of which the suit has been brought, was undischarged;" and that "it must be considered that it is now established that damage to unburnt portions of the cargo, caused by water intentionally used to extinguish a fire in a ship, is of the nature of a general average loss." 137 Mass. 472.

Yet the claim of general average was disallowed, because the fire was not extinguished by the master or by any person in charge of the steamship or her cargo, but by the chief engineer of the fire department of the city, acting not as the agent of the owner of the ship, but under his own public employment, vesting him with authority over all property within the municipality, the burning of which was dangerous; and the essential requisites of a general average loss were stated as follows: "To constitute a general average loss, there must be an intentional sacrifice of a part of the property, for the purpose of saving the remainder from a common peril, or extraordinary expenditures must be incurred for the purpose of saving the property in peril. The authority to determine when a sacrifice should be made, and what property shall be sacrificed, rests with the master or other person lawfully in command of the ship. His right to sacrifice the property of other persons than the shipowner is derived from necessity, whereby, in circumstances of great peril, he becomes the agent of all persons whose property in the common adventure is in peril. If this property is injured or destroyed by strangers to the ship and cargo, who are not employed by the master or other person in command, it is not a general average loss. This is evident, if the act of the stranger is a tort; but we do not see that it makes any difference in principle, if the act of the stranger is justifiable, on the ground of public or paramount right. The distinction between a fire put out by the authority of the master, or other person in command, and one put out by public authority, without regard to the will of the master, we think, is sound. When a ship has been brought to a wharf, so far as it has become

subject to municipal control, if that control is exercised, we think that it stands no differently from any other property within the municipality, over which the same control has been exercised; and that the general maritime law does not cover the reciprocal rights and obligations of the parties to the maritime adventure, so far as the consequences of this control are concerned, but that they are to be determined by municipal law." 137 Mass. 473, 474.

The case at bar comes to this court by appeal from the Circuit Court under the act of February 16, 1875, c. 77, § 1, by which that court is required to state its findings of facts and its conclusions of law separately, and the jurisdiction of this court is limited to the determination of the questions of law presented by the record. 18 Stat. 315. The findings of facts by the Circuit Court are conclusive, and cannot be added to or qualified, by referring to the evidence taken in the cause, or to the opinion of that court, or of the District Court. *The Annie Lindsley,* 104 U. S. 185, 187; *Sun Ins. Co.* v. *Ocean Ins. Co.,* 107 U. S. 485, 500; *The Gazelle,* 128 U. S. 474, 484; *The City of New York,* 147 U. S. 72, 76.

The leading facts found by the Circuit Court are as follows : The vessel, when the cargo in her hold took fire, was moored in the port of Calcutta, and near other vessels, as is shown by the finding of fact that, as soon as the mate sounded the alarm of fire, "from sixty to seventy men from the crews of the neighboring vessels" came to his assistance, bringing their buckets with them, as well as a force-pump "from a ship near by," and poured water into the hold. Afterwards, the port authorities came with fire-engines, and took the direction of the vessel, and were found by the master, when he returned on board, in charge of her. The port authorities pumped steam and water from their engines into the hold, and moved the vessel from her moorings and put her aground. The master does not appear to have objected to their taking charge of and moving the ship, and any objection on his part would have been futile, for it was clearly within their powers as con-servators of the port. The master successfully removed part of the cargo, and desired, and believed it to be prudent and

feasible, to remove more. But the port authorities forbade and prevented his doing so, because of the danger of increasing the fire, and, acting upon their own judgment, extinguished the fire by scuttling the vessel, whereby she became a wreck, not worth repairing. The master, being then permitted by the port authorities to resume charge of the vessel, saved the rest of the cargo in a damaged condition.

If the course desired and proposed by the master had been followed, the injuries, either to the cargo or to the ship, or to both, might have been different from those caused by the measures taken by the port authorities; and the difference in the property sacrificed might have affected the adjustment of contribution in general average.

The Circuit Court, indeed, has found, as facts, that " the measures taken by the mate before the port authorities took charge of the ship, and those subsequently taken by the port authorities, were the best available to extinguish the fire, and to save greater loss upon the cargo." But it is not found whether the motive and purpose of the port authorities was to save this vessel and her cargo, or to save other vessels and property in the port; whereas, in order to constitute a general average, the sole object of the sacrifice must appear to have been to save this vessel and cargo. Moreover, by the law of general average, the question what measures were the best and most prudent, the most feasible and available, to extinguish the fire, or, in other words, what part of the maritime adventure should be sacrificed, and in what manner, for the safety of the rest of the adventure, was to be determined by the master at the time of the emergency; and his determination, faithfully and reasonably made, was, so far as affects the right of mutual contribution between the parties to the adventure, not to be overruled by the municipal authorities at the time, or by the court long afterwards.

The result of the principles above stated, confirmed by the authorities above referred to, may be summed up as follows:

The law of general average is part of the maritime law, and not of the municipal law, and applies to maritime adventures only.

To constitute a general average loss, there must be a voluntary sacrifice of part of a maritime adventure, for the purpose, and with the effect, of saving the other parts of the adventure from an imminent peril impending over the whole.

The interests so saved must be the sole object of the sacrifice, and those interests only can be required to contribute to the loss. The safety of property not included in the common adventure can neither be an object of the sacrifice, nor a ground of contribution.

As the sacrifice must be, for the benefit of the common adventure, and of that adventure only, so it must be made by some one specially charged with the control and the safety of that adventure, and not be caused by the compulsory act of others, whether private persons or public authorities.

The sacrifice, therefore, whether of ship or of cargo, must be by the will and act of its owner, or of the master of the ship, or other person charged with the control and protection of the common adventure, and representing and acting for all the interests included in that adventure, and those interests only.

A sacrifice of vessel or cargo by the act of a stranger to the adventure, although authorized by the municipal law to make the sacrifice for the protection of his own interests, or of those of the public, gives no right of contribution, either for or against those outside interests, or even as between the parties to the common adventure.

The port authorities are strangers to the maritime adventure, and to all the interests included therein. They are in no sense the agents or representatives of the parties to that adventure, either by reason of any implied contract between those parties, or of any power conferred by law over the adventure as such.

They have no special authority or special duty in regard to the preservation, or the destruction, of any vessel and her cargo, as distinct from the general authority and the general duty appertaining to them as guardians of the port, and of all the property, on land or water, within their jurisdiction.

Their right and duty to preserve or destroy property, as necessity may demand, to prevent the spreading of a fire, is

derived from the municipal law, and not from the law of the sea.

Their sole office and paramount duty, and, it must be presumed, their motive and purpose, in destroying ship or cargo, in order to put out a fire, are not to save the rest of a single maritime adventure, or to benefit private individuals engaged in that adventure; but to protect and preserve all the shipping and property in the port, for the benefit of the public.

In the execution of this office, and in the performance of this duty, they act under their official responsibility to the public, and are not subject to be controlled by the owners of the adventure, or by the master of the vessel as their representative.

In fine, the destruction of the J. W. Parker by the act of the municipal authorities of the port of Calcutta was not a voluntary sacrifice of part of a maritime adventure for the safety of the rest of that adventure, made, according to the maritime law, by the owners of vessel or cargo, or by the master as the agent and representative of both. But it was a compulsory sacrifice, made by the paramount authority of public officers deriving their powers from the municipal law, and the municipal law only; and therefore neither gave any right of action, or of contribution, against the owners of property benefited by the sacrifice, but not included in the maritime adventure, nor yet any right of contribution as between the owners of the different interests included in that adventure.

Mr. Justice Jackson, now absent, took part in the decision of this case, and concurs in the opinion of the court.

*Decree reversed, claim of general average for loss or damage by the acts of the port authorities disallowed, and case remanded to the Circuit Court for further proceedings consistent with this opinion.*

Mr. Justice Brown, with whom concurred Mr. Justice Harlan, dissenting.

I am compelled to dissent from the opinion of the court in this case. I find myself unable to escape the conviction that

a person who has lawful possession of a vessel, and exercises the authority of a master over it, either by appointment or consent of the owner, or by operation of law, is to be considered the master *pro hac vice*, and competent to bind the vessel or her cargo by all acts within the scope of his apparent authority.

There is in this case a failure to find an important fact, namely, whether the action of the port authorities was taken in the interest of the ship and cargo alone, or in the interest of other neighboring property exposed to the conflagration. In the opinion of the court it is assumed that the barque was moored near to other vessels, from the fact found by the Circuit Court that as soon as the mate sounded the alarm of fire, "from sixty to seventy men from the crews of the neighboring vessels came to his assistance," bringing their buckets with them, as well as a force-pump "from a ship near by," and poured water into the hold. That appears to me very slender evidence upon which to base the opinion that the action of the port authorities was dictated mainly by a desire to prevent a general conflagration, especially in view of the fact that the District Judge in his opinion, which under our rules is sent up with the record in the case, states that "if it appeared in this case, or if the evidence warranted the inference that their measures were adopted in view of any actual or supposed danger to the port, or to other ships, and that they acted differently than if the common benefit of the ship and cargo alone were considered; in other words, if there was any sacrifice of the ship and cargo for the supposed interest of other property, I should consider the case not one of general average. But there is no evidence to warrant any such inference. This ship was far from shore, and apparently threatened no other property. The circumstances do not indicate that there was any conflict of interests between the ship and the shore; or that the port officials in any degree designed to sacrifice, or did sacrifice, any interest of the cargo to the safety of other property. There was no occasion and no motive for their doing so. The most that can be inferred is that there was some difference of judgment between them

and the master as to the amount of exposure it was prudent to permit to the smouldering fire; and in case of a difference of judgment, the determination must rest upon those upon whom the law for the time being imposes the responsibility of action; in this case, the port officials." He further finds that "the port officials were by law in command while the ship was on fire; that the purpose of the act of sacrifice was the common good of the ship and cargo alone; that the circumstances indicate that there was not in this case any interest of the port, or of other vessels, that in the least influenced the port officials in their action, or the smallest sacrifice of the ship or cargo in reference to any outside interests."

It may be true that the facts here stated, not being incorporated in the findings, are not such as can be considered by us upon appeal to this court; but speaking for myself, I think the case should have been remanded for a further finding upon this point, since it is quite possible these facts might be considered as having a bearing upon the result. The opinion, however, is put upon the broad ground that the sacrifice must not only be for the benefit of the common adventure, but must be made by some one specially charged with the control and safety of that adventure, and must not be caused by the compulsory act of others, whether private parties or public authorities. To this I am unable to give my assent.

No authority is cited in support of this proposition except the single case of the *Wamsutta Mills* v. *Old Colony Steam Boat Co.*, 137 Mass. 471, in which it appeared that the steamship was lying at a wharf, " near other vessels, and near buildings," when a fire broke out in her hold, and that what was done was necessary to extinguish the fire, which, if allowed to burn, would have spread to the neighboring vessels and buildings. The opinion of that court, though perhaps broader in some of its statements than the circumstances of the case called for, carefully distinguishes between cases where action is taken for the protection of the vessel and cargo alone, and those wherein action is taken for the supposed benefit of the public. In delivering this opinion, Mr. Justice Field said " that it was necessary to do what he " (the chief engineer) " did, not only for

the purpose of saving the ship and cargo, but for preventing the spread of the fire to buildings and other property in the city. . . . No one has a right to have his property burn, if thereby the property of others is endangered. . . . In taking possession of property for the purpose of extinguishing a fire that threatens to spread to other property, the chief engineer . does not act as agent of the owner, but under a paramount right. If, indeed, the fire does not endanger the property of others, he may act merely *as the agent of the owner;* but if the safety of other property is imperilled, he must act under his public responsibility." While this case is distinguishable from the one under consideration in the particular above stated, its general statements have not escaped criticism. At the annual meeting of the British Association of Adjusters the case was commented upon by the president as "much at variance with our law," that is, the law of England.

I see no reason for criticising the case of the John Perkins, and none for changing the opinion expressed by me in the case of the James P. Donaldson. But it seems to me they have only the remotest analogy to the case under consideration. The first case involved the power of the custodian of a ship, who for the time being represented the master, to bind *another* ship to contribute to the sacrifice of the cable and anchor of his own ship. The second case involved the right of a tow to recover compensation in general average for a sacrifice made by the master of *another* ship, namely, the tug by which she was being towed, in casting off her tow line and suffering her to go ashore. In each case there was an attempt to extend the law of general average beyond the ship and cargo engaged in the particular adventure.

A case which seems to me to be more closely allied in principle to the one under consideration is that of *The China,* 7 Wall. 53, in which this court held, contrary to the English, but conformably to the continental, authorities, that a vessel was liable for the consequences of a collision through the negligence of a pilot taken compulsorily on board, although it was admitted that, if the action had been at common law against the owner, and probably also *in personam* in admiralty, there

could have been no recovery, as a compulsory pilot is in no sense the agent or servant of the owner. The opinion must necessarily rest upon the ground that the vessel is in some sense herself a principal, and any one having lawful command of her is, for the time being, her agent, for whose conduct she is herself responsible both in contract and in tort. The principle of the case is, that a person who is exercising the authority of a master by operation of law is to be considered as master *pro hac vice*, and as invested with authority as such.

While the master is, under ordinary circumstances, undoubtedly the person to direct that the sacrifice should be made, it was held in *Price* v. *Noble*, 4 Taunt. 123, that a jettison made by a prize crew put on board of a British ship was a proper subject for a general average contribution. This was an action by the owners of a ship, which had been captured by a French privateer, and put in charge of a prize master and a part of the privateer's crew, against the owners of the cargo for a general average contribution caused by throwing overboard certain anchors, cables, and other stores. The jury found a verdict for the plaintiffs subject to the question whether, under the law, they were entitled to recover. The argument made in behalf of the defendants was that "every person who puts goods on board a ship, tacitly contracts to intrust their safety to the discretion of the master of the ship, and to abide by his judgment of the necessity of sacrificing a part of the ship or cargo for the preservation of the rest, and, in case of such necessity, to contribute accordingly; but the sacrifice in this case made is not dictated by the master and mariners of the ship, but by strangers, to whom the respective owners of ship and cargo have never delegated the like discretion." Sir James Mansfield held the objection to be untenable, and refused to set aside the verdict, though the mate, who must have been their prisoner, and hence without authority, appears to have concurred in the action of the prize crew.

That damage done by pumping in water, or by scuttling and sinking the ship and extinguishing a fire, is a subject of general average contribution is now too well settled both in

England and in this country to be longer a question of doubt, although the practice was formerly the other way. There is no disagreement upon this point. That there must be a common danger in which ship, cargo, and crew all participate; that the sacrifice must be necessary, or at least made in the exercise of a reasonable judgment that it was necessary; and that it must be voluntary, is also admitted. But whether the water be pumped in by the crew, or by a fire-engine stationed on shore, is quite immaterial, as was held in *Nelson* v. *Belmont*, 5 Duer, 10; *S. C.* 21 N. Y. 36; *Gregory* v. *Orrall*, 8 Fed. Rep. 287; *The Roanoke*, 46 Fed. Rep. 297; *S. C.* 53 Fed. Rep. 270, and 59 Fed. Rep. 161; *Stewart* v. *West India &c. Steamship Co.*, L. R. 8 Q. B. 88.

But if the master be engaged in extinguishing a fire by pumping in water, and the damage thereby done subjects the property saved to a general average contribution, I fail to see why he should lose his right to such contribution, if the port authorities, acting under a local ordinance, interfere and take possession of the vessel, and do exactly what he was engaged in doing, but more efficiently and expeditiously. It was for the interest of all parties that the fire should be extinguished as quickly as possible, and if the port authorities had more efficient means for such purposes than the master, and therefore interfered to assist him, it seems to me he should not lose his right to contribution. His loss was no greater than it would have been, if the port authorities had not interfered. The damage to the cargo was evidently much less, so that the shippers were obviously benefited by such interference. Under such circumstances it appears highly inequitable that they should set up a defence which they would not have been able to assert, if their loss had been greater.

If it be true, as assumed in the opinion of the court, that the right to a general average contribution arises, not from the contract of the parties, but from operation of law and upon principles of natural justice, it seems an anomaly to say that one who is in possession of the vessel by act of law is not in a position to make a sacrifice, out of which a right of contribution shall arise. The consequences of the rule an-

nounced by the court might, under certain circumstances, be so inequitable as at once to challenge its soundness. Suppose, for instance, the master had nearly succeeded in extinguishing the fire before the port authorities had arrived, and, against his protest, had assumed charge of the vessel. Under such circumstances, he would clearly be entitled to contribution from such of the cargo as he had already saved, but how would it be possible to distinguish between that and such as might have been saved after the port authorities took possession? In saying that the sacrifice must have been made by the act of the master, the law evidently intends not that the word "master" shall be taken in its technical sense, but that the act must be that of one in authority, and must be the result of the judgment of some one competent to judge and with authority to act, as distinguished from the hasty and arbitrary or timorous action of the crew or of a passenger, who have no authority to bind the vessel.

Suppose, for instance, a vessel and cargo be discovered abandoned at sea and derelict, and be taken possession of by salvors, who, for the purpose of saving the property, throw overboard a portion of the cargo. Can it be possible that the value of the property so jettisoned should not be estimated in the salvage expenses, and be contributed for by the property thus saved? There can be no question that, under such circumstances, the salving vessel would be entitled to remuneration, but the logical result of the opinion of the court in this case is that the owner of the property thrown overboard would lose its entire value, because the salvors are not agents of the owners of the vessel, and are strangers to the adventure.

In this case there is no finding that the port authorities took charge of the fire against the will of the master or mate, but upon his return on board the master found them in charge. There is no finding that he made objection to this. The only disagreement between him and the port authorities seemed to arise from the fact that the master, after having "removed 552 bales of jute from the barque, desired to remove more; but the port authorities objected and forbade it,

because of the danger of increasing the fire." But this was evidently a disagreement as to a minor particular, and there is an express finding that " the measures taken by the mate before the port authorities took charge of the ship, and those subsequently taken by the port authorities, were the best available to extinguish the fire and to save greater loss upon the cargo." There seems to have been no objection at the time to the port authorities moving the ship and putting her aground, although the master subsequently incorporated an objection to such action in his protest. In fact, the District Judge states that "the master did not object to the scuttling," and that the chief difference between them was with respect to keeping the hatches open longer for the purpose of removing more of the cargo, to which the officials objected, in consequence of the increased draft of air serving as fuel to the flames.

The opinion of the court tends, in every such emergency, to put the master and local authorities in antagonism, to give rise to unseemly conflicts between them, and to prevent the master from availing himself of their superior facilities for extinguishing fires. It seems to me there is no distinction in principle between a sacrifice made by a master and one made by authority of law, provided the common safety of the ship and cargo be the object of their action.

I am authorized to state that MR. JUSTICE HARLAN concurs in this dissent.