## THE NORTHERN NO. 30.

District Court, E. D. North Carolina, Wilmington Division. March 14, 1928.

1. **Shipping ⊝186—Law of general average is part of law of the sea.**

   Law of general average, requiring contribution in such ratio, is a part of the law of the sea, as distinguished from the law of the land.

2. **Shipping ⊝190—General average held applicable as to cargo damaged by water used by city fire department in extinguishing flames solely for preservation of barge and cargo.**

   Where master of barge at time of fire acquiesced at least in action of city fire department in extinguishing flames, and services rendered by fire department were for the sole preservation of barge and its cargo, and not for the protection of adjacent property and neighboring shipping, doctrine of general average as relating to contribution for damages to cargo resulting from water was applicable.

3. **Shipping ⊝190—General average arises if city fire department, in extinguishing fire on barge, acts solely for protection of vessel and cargo.**

   If action of city fire department in extinguishing fire on barge is for protection of vessel and cargo only, general average arises, regardless of whether master invoked aid of municipal authorities or whether the same was invoked under and by virtue of his authority.

In Admiralty. Suit by the Armour Fertilizer Works against the barge Northern No. 30, her equipment, tackle, apparel, etc. Decree for libelant.

Rountree & Carr, of Wilmington, N. C., for libelants.

John W. Oast, Jr., of Norfolk, Va., and Isaac C. Wright, of Wilmington, N. C., for respondents.

MEEKINS, District Judge. [1] This is a cause in admiralty, and the only question presented was the right of the libelant, a corporation, to recover contribution in general average. The law of general average is a part of the law of the sea, as distinguished from the law of the land. Perhaps the necessity for such distinction was that there are all shades of ferocity in the vast and cunning sea which Jean Bart called "the great brute." It's the claw's scratch with intervals of velvet pawing. It's never fiercer—the sea—than when a pond, a pool of liquid lead. Gloomy immobility: the prelude to storms, tempests, and hurricanes, which sweep over the face of the waters with the fury of charging Cossacks over the snow-crusted steppes of Russia.

The maxim of the Rhodian law, the foundation of general average, did not in terms

extend further than to cases of jettison (Jonah is a chapter in its history) but the principle applies to all other cases of voluntary sacrifice, properly made, for the benefit of all. The maxim itself is probably an imperfect statement in writing of the principle known to the common law of the seas, illustrating the general principle by a perfect example.

The rule for contribution in general average is a rule both of equity and policy which has come down through the centuries and entered into the general maritime law. It has been preserved in England without enforcement by statute.

According to at least one admiralty textwriter, Hughes, to establish general average it must appear affirmatively that the sacrifice was voluntary, and for the benefit of all; that the sacrifice was made by the master, or by his authority; that the sacrifice was not caused by any fault of the party asking the contribution; that the sacrifice was necessary; and that the sacrifice was successful.

There is no serious dispute between the libelant and the respondent with regard to the presence, in the instant case, of all the requisites of the right of contribution in general average except as to the one requisite, "that the sacrifice was made by the master, or by his authority," which the libelant asserts and which the respondent denies, and this presents the sole question in the case; namely, Is the libelant entitled to contribution in general average for damage accruing to its shipment of fertilizer in the respondent's barge by reason of water poured into the hold of the barge by the Wilmington fire department in the circumstances disclosed by the evidence in this cause?

The libelant relies on two positions: First, that the service of the Wilmington fire department was invoked by the master of the barge, or by his authority, for, if rendered by his authority, express or fairly implied from his conduct, it was in law, at his request, and therefore performed at his instance; and, second, that the service of the Wilmington fire department was performed for the sole benefit and protection of the particular barge and cargo, and not in any wise for the benefit and protection of adjacent property on the shore or neighboring shipping in the harbor. Both positions are vigorously challenged by the respondent. The libelant says that general average arises on either of the above positions and refuses to concede that both do not establish general average in the circumstances of this case.

I proceed to the consideration of the two questions above presented in the light of the facts and the reasonable inferences and deductions and conclusions to be drawn therefrom, which I think distinguish this case from Ralli v. Troop, 157 U. S. 386, 15 S. Ct. 657, 39 L. Ed. 742, on which the respondent rests its contentions.

On August 25, 1920, the barge Northern No. 30 arrived at Wilmington, North Carolina, with a cargo of about 2,100 tons of acid phosphate shipped and owned by Armour Fertilizer Company. The barge was made fast at the Seaboard Air Line Railway wharf, and discharge of the cargo began immediately and continued until at or about 6 o'clock p. m., when the work was terminated for the day; there being approximately 110 tons of the cargo discharged at the time the work ceased. At about 10 o'clock on the night of August 25, 1920, the master of the barge, who was sleeping aboard, was awakened by the cook, who told the master that he smelled smoke. The master investigated and found smoke coming from the booby hatch, and, when the hatch cover was taken off, discovered the barge was on fire, the seat of the fire being between the deck and the ceiling of the deck of the barge.

The fire under the boilers of the barge had burned out, and consequently there was no steam with which to operate the pumps, and there was no fire hose or other fire apparatus on the barge for use in extinguishing fire. The master, and such of the crew as were present, were helpless under the condition, and, realizing that the barge and its cargo was in imminent danger of destruction, the master sought outside assistance. He told John Avery, his donkeyman, an able seaman, to turn in the city fire alarm in order to summon the fire department of the City of Wilmington to the scene of the trouble. The master then asked a watchman who was on the dock, guarding the wharf and sheds and other property of the Seaboard Air Line Railway, if there were any fire hose anywhere near that he could get, and the watchman took the master, and certain of his crew, into one of the sheds on the wharf and pointed out a quantity of hose.

In the meantime the donkeyman had reported to the master that he could not find a fire alarm, and therefore no summons had reached the city fire company. At or about this time the watchman, after pointing out to the master the fire hose in the shed, said in the presence of the master (if not to him) and certain of his crew that he would go

and turn in the city fire alarm, which he promptly did.

The master and certain of his crew took the hose shown him by the watchman and attached it to one of the city fire hydrants on the dock, and when he lengthened out the hose the master found it was by some 10 feet too short to reach the open hatch of the barge for the purpose of pouring water into its hold and extinguishing the fire. This helpless situation continued until the fire company arrived, in response to the alarm turned in by the watchman on the dock, and immediately upon its arrival the master, either with his own hands or under his direction to some of his crew, turned over to the chief of the fire company the hose which he had been trying to use, and after another piece of hose had been coupled to it by the fire department the master and crew showed the firemen where the trouble was located on the barge, took off its hatches and lowered a ladder into its hold in an attempt to get at the seat of the fire, and the fire company played water into the hold of the barge through the open hatchway in an effort to extinguish the fire and flooded the cargo of acid phosphate. The ladder used was like Jacob's—it served its purpose—though men and not angels ascended and descended it and it did not reach to heaven.

After considerable water had been poured into the hold, the acid phosphate, which was loaded in bulk in the hold of the barge, formed on its surface a state of semisolution and therefore its resistance was not sufficient to sustain the weight of the firemen in the hold seeking to reach the seat of the fire. Seeing the firemen mire in the slush of the acid phosphate, the master of the barge suggested that a small yawl boat lying on the deck of the barge, and belonging to the barge, be lowered into the hold so that the firemen could stand in the yawl boat and play the water into the ceiling, where the fire seemed to be. This suggestion was adopted, and as a result the fire was finally extinguished.

It appears it was several hours from the time the fire was discovered before it was extinguished, and that between 3 and 4 o'clock of the morning of August 26, 1920, the master of the barge had his cook prepare refreshments for the firemen, consisting of coffee, sandwiches, etc., of which they partook.

It will be observed the master was present throughout, at all times acquiescing in what was done, and at other times giving specific directions as to what should be done and participating in what was actually done.

The chief of the fire department, in his

testimony, stated that when he arrived at the scene of the fire there was no threatened danger to any of the adjacent property, and that at no time was adjacent property threatened by the fire. He further testified that when he arrived at the barge he would not have gone on the barge and attempted to extinguish the fire if the master of the barge had told him not to, and that in such circumstances he would not have interfered unless and until it became apparent, in his opinion, that the fire was likely to spread to the adjacent property.

The chief of the fire department further testified that the barge and its cargo would have been destroyed entirely but for the efforts of the fire company to extinguish the fire, and that he rendered the assistance solely for the protection of the barge and its cargo.

It is not disputed that a large volume of water was poured into the hold of the barge which thoroughly wet the acid phosphate, causing it much damage, and that the barge itself suffered injury by the fire.

From the facts, there can be little doubt that, if the Wilmington fire department had not arrived at or about the time it did, the damage to both barge and cargo would have been much greater than it was, and it is not unreasonable to conclude that the entire adventure might have been sacrificed. There can be little doubt that the adjacent property was at no time in danger by reason of the fire on the barge, and that the fire department of the city of Wilmington acted solely for the préservation of the barge and its cargo and in no wise for the preservation of adjacent property on the shore and neighboring shipping in the harbor.

The respondent contends that, notwithstanding the great benefit which accrued to it by reason of the service of the Wilmington fire department, it should not be held to contribute to the damage sustained by the cargo, because the master of the barge did not in so many words request or procure the service of the Wilmington fire department to extinguish the fire, but that the master merely acquiesced in what the fire department did, and therefore the sacrifice was not made by the master or by his authority, and to support its position relies on Ralli v. Troop, supra.

The facts in Ralli v. Troop, supra, are different from the facts in the instant case. In Ralli v. Troop, supra, the J. W. Parker was moored at one of the docks in the port of Calcutta. The fire department of the port of Calcutta voluntarily came to the

scene of the fire and, so far as the record shows, without suggestion on the part of any one in charge of the vessel, assumed control of the vessel, and when the master returned to the vessel he found the port authorities in charge. The port authorities moved the ship and put her aground. The master removed 552 bales of jute from the vessel, and desired to remove more of the cargo, but the port authorities forbade it. The master believed that it was prudent and feasible to discharge more cargo at the time he was prevented from doing so by the authorities.

The measures taken by the mate (it seems the master was absent when the fire broke out) before the port authorities assumed control of the ship, and those subsequently taken by the port authorities, were the same and the best available to extinguish the fire and to save the greater loss of the cargo. The master was deprived of the command of his vessel by the municipal authorities of the port of Calcutta, and refused permission by them to discharge his cargo in an effort to save it after actual discharge had begun. The vessel was not only cut from her moorings and run aground, but was scuttled and sunk.

After the master of the J. W. Parker was allowed by the port authorities to resume charge of the vessel, he proceeded to save the residue of the cargo.

Moreover, it appears that when the municipal authorities of the port of Calcutta reached the scene of the fire, adjacent property on the shore and shipping in the harbor was in imminent danger of damage and destruction through spreading of the fire from the J. W. Parker. It also clearly appears that the action on the part of the municipal authorities of the port of Calcutta was prompted solely for the preservation of adjacent property and not for the particular benefit of the vessel and cargo. The master suggested nothing, did nothing, and the record discloses that he was absent when the municipal authorities arrived, and that on his return he found the municipal authorities in charge of his vessel.

On the statement of facts presented in Ralli v. Troop, supra, it was obvious that the sacrifice was not made by the master or by his authority, and that the service of the municipal authorities was for the benefit of adjacent property, which was in danger, and not for the sole benefit of the particular vessel and cargo, and therefore general average did not arise. In that case the master of the vessel and no one under his authority or in charge of the vessel during the master's ab-

sence invoked the aid of the municipal authorities of the port of Calcutta. On the contrary, it appears that the municipal authorities, ex mero motu, took charge of the entire situation, ignored every one in command of the vessel, refused to follow the suggestions of the master at all times, and actually deprived him of the control of the J. W. Parker, pro hac vici.

In the instant case the master of the barge was present and invoked the aid of the municipal authorities of the port of Wilmington, and, when the authorities arrived, not only acquiesced in what was done, but made suggestions as to what should be done, and actually participated, in whole or in part, in what was done by the municipal authorities. Moreover, in the instant case it is clear that the action on the part of the municipal authorities was prompted solely for the benefit of the particular barge and cargo and not for the benefit of adjacent property on the shore and neighboring shipping in the harbor, for that, when the municipal authorities arrived at the scene of the fire, no danger was threatening either.

When the municipal authorities arrived, the master was ineffectually undertaking to pour water into the hold of the barge, which was later effectually done by the Wilmington fire department. The master gave directions to the crew to remove the hatches of the barge and to lower a ladder into the hold of the barge, and suggested and directed that a yawl boat belonging to the barge be placed in the hold of the barge so that the firemen could thereby the better reach the seat of the mischief. The first act of the master, after assuring himself that the barge was on fire, was to send his donkeyman, John Avery, to turn in the city fire alarm, which would have been done but for the fact that John Avery could not find the fire alarm. Thereafter, in the presence of some of the crew, the watchman on the dock told the master he was going to turn in the city fire alarm, and the master made no protest, presumably because that was exactly what he desired to be done, knowing that the efforts of the donkeyman under his direction had failed with this regard.

When the fire company arrived, the master was attempting to use the hose belonging to one of the warehouses, and had connected it with a fire hydrant of the municipal authorities of the port of Wilmington and voluntarily turned over the defective apparatus to the fire department when it arrived, because the hose was too short to pour water into the hold of the barge.

To say that in these circumstances the

service rendered by the fire department was not at the instance of the master of the barge, or without his authority, is to beg the question. Can it be plausibly maintained that, because the master of the barge did not stand at strict attention, and, with studied inflection and practiced gesture, formally demand or request in so many spoken words assistance from the outside, general average cannot be invoked? As a flash of lightning in the dark reveals what years of daylight have failed to discover to the eye, so in moments of great emergency and excitement actions speak louder than words, because they are more effective. In such moments a request may be made or a command may be given with assurance of certain sudden and swift response by a look or gesture. I do remember me that in my youth when on mischief bent my mother had a way of giving me a certain look. I knew precisely what that signal meant, and it always proved as duly effective as the use of the well-seasoned hickory, which was her police power, ever ready to enforce her commands. Yet my mother spoke never a word.

To say that the service rendered by the Wilmington fire company was not at the request of the master of the barge, or under his authority, is to characterize the whole performance as a great parade to no purpose. The master did everything possible to procure the service of the fire company, and, after its arrival, participated actively by suggestion and direction in the service rendered, and was not content to maintain merely an acquiescent attitude.

[2] I have carefully read and considered Ralli v. Troop, supra, and I am of the opinion that, if the facts in that case had been that the municipal authorities acted solely for the benefit of the J. W. Parker and her cargo and not in the furtherance of its public duties in preserving neighboring shipping and adjacent property, notwithstanding the authorities were not invoked by the master or some one under his authority, the court would have sustained the doctrine of general average, and in the instant case I am of opinion, even though it be conceded that the master merely acquiesced in what was done (but as a matter of fact he did far more than that—he invoked the aid of the municipal authorities), general average arises, because it is undisputed that the service rendered by the Wilmington fire company was for the sole preservation of the barge and its cargo and not for the protection of adjacent property and neighboring shipping which at no time was imperiled.

Moreover, the jurisdiction of the Supreme Court in Ralli v. Troop, supra, was restricted to the determination of questions of law presented by the Circuit Court's findings of fact. Mr. Justice Gray, said, at page 417 (15 S. Ct. 669):

"The case at bar comes to this court by appeal from the Circuit Court under the Act of February 16, 1875, c. 77, § 1 [28 USCA § 771; Comp. St. § 1585], by which that court is required to state its findings of facts and its conclusions of law separately, and the jurisdiction of this court is limited to the determination of the questions of law presented by the record. 18 Stat. 315. The findings of facts by the Circuit Court are conclusive, and cannot be added to or qualified by referring to the evidence taken in the cause, or to the opinion of that court, or of the District Court. * * * It is not found" as a fact by the Circuit Court "whether the motive and purpose of the port authorities was to save this vessel and her cargo, or to save other vessels and property in the port; whereas, in order to constitute a general average, the sole object of the sacrifice must appear to have been to save this vessel and cargo."

And Mr. Justice Brown, in the dissenting opinion, said, at page 421 (15 S. Ct. 670):

"There is in this case a failure to find an important fact, namely, whether the action of the port authorities was taken in the interest of the ship and cargo alone, or in the interest of other neighboring property exposed to the conflagration."

All of which seems to me to show that the judges in that case were of one mind on the question that general average would arise when the public authorities aided a ship for the benefit of the ship and the cargo as distinguished from public property generally, even though the master did not invoke their aid.

On the whole record it seems clear that the answer to the first question (Was the sacrifice made by the master or by his authority?) is that the action of the Wilmington fire department in extinguishing the fire on the barge was invoked by the master of the barge, and therefore the service was rendered under and by virtue of his authority. If so, general average arises.

[3] It is equally clear that the answer to the second question (Was the service of the Wilmington fire department rendered for the sole benefit of the barge and its cargo?) is that the service of the Wilmington fire department was for the sole benefit of the barge and its cargo, and was in no

wise performed for the benefit of adjacent property on the shore or neighboring shipping in the harbor, and that the action of the fire department was in no sense prompted by reason of the preservation of public property generally, but its inception and purpose, as shown by all the subsequent facts, and result, was the protection of the ship and cargo. If so, general average would arise, regardless of whether the master invoked the aid of the municipal authorities or whether the same was invoked under and by virtue of his authority.

I am of the opinion that the most significant act of the master, standing separate and apart from his every other act, was attaching the hose which he found in the shed to the fire hydrant of the city of Wilmington, and that that act itself invoked the aid of the municipal authorities and, therefore, is sufficient to establish the contention of the libelant that the subsequent assistance rendered by the fire department of the city of Wilmington, under the circumstances shown in the record, was at the instance and procurement of the master and under and by virtue of his authority, because thereby he invoked the only effective and available agency which acted under his invitation and cooperation. This significant act was one of a number of acts constituting one and the same continuous transaction. Therefore the legal effect of the action of the firemen in their efforts to extinguish the fire on the barge was the same as the action of the master himself, and the subsequent flooding of the cargo of the barge was the direct act of the master and crew. But, however this may be (the act of attaching the hose to the city fire hydrant by the master or under his direction by one of his crew), when all the other incidents, acts and things done, happened, and performed, by the master, are taken in conjunction with the one act of the master in attaching the hose to the fire hydrant, coupled with all the other facts, there is no escape from the conclusion that the requisites of general average have been established in this case and that the libelant, therefore, is entitled to recover.

An agency may be gratuitous, and a public fire department, in taking charge of a ship on fire, may act as the agent of the ship owner, or at the instance of the master of the vessel or by one under his authority. If,

therefore, a fire department acts at the request of the ship owner or at the request of the master or some one under his authority, for the sole purpose of saving a particular ship and cargo and not other property, it acts as his agent whether it is paid or not. So, therefore, the question here harks back to whether in the first place the aid of the municipal authorities of the port of Wilmington was invoked by the master of the barge or under his authority, and, in the second place, whether the service rendered by the municipal authorities was for the sole benefit, protection, and preservation of the particular barge and cargo and not in any wise for the benefit, protection, and preservation of adjacent property, etc.

The answer to the questions whether the action of the Wilmington fire department was at the request and procurement of the master of the barge or by his authority and whether such action was for the sole benefit, protection, and preservation of the barge and its cargo and not in any wise for the benefit, protection, and preservation of adjacent property, is found in what orders were given, and by whom; what was done, and who participated therein; how it was done, and why; and the accruing benefits flowing therefrom, and to whom.

I am clearly of the opinion that, in the circumstances of the instant case, if ever equity and policy should apply, it is here. Strip this case of its maritime character, and equity would cry aloud. If equity and policy are to be denied in the circumstances of this case, then man's law of the sea is not less but more inexorable and cruel than nature's law of the sea, which is governed by the blind forces of wind and wave and the hidden dangers of rocks, shoals, and shallows; if equity and policy and substantial justice are to be denied in the circumstances of this case because it comes under the law of the sea as distinguished from the law of the land, and general average, therefore, does not arise, then authority for my dissent is Mr. Bumble in Great Expectations.

I hold, on all the foregoing facts and circumstances, reasonable inferences, and conclusions, that the libelant is entitled to contribution in general average in this cause, and therefore I have drawn a decree in accordance with this opinion.