## THE BELLINGHAM.

## A. C. MONK & CO. v. UNITED STATES.

District Court, D. New Jersey.
April 8, 1931.

Bigham, Englar & Jones, of New York City, and McDermott, Enright & Carpenter, of Jersey City., N. J. (T. Catesby Jones and James W. Ryan, both of New York City, of counsel), for libelant.

Walter G. Winne, U. S. Atty., of Hackensack, N. J. (William E. Collins and Edwin H. Mead, both of New York City, of counsel), for respondent.

CLARK, District Judge.

The ultimate facts upon which these libels are based are not in dispute. The inference both factual and legal, however, are and were the basis of a somewhat unsatisfactory contest before this court. The libelant company are tobacco merchants. In the course of their business they intrusted 101 hogsheads of bright leaf Virginia tobacco (98 of leaves and 3 of stems) to the United States Shipping Board for shipment to Rotterdam. The vessel in which the merchandise was stowed was the S. S. Bellingham. The place of storage was the No. 2 lower hold of that vessel; the hogsheads being stowed on tanks in the bottom of the hold and rested on steel plates and dunnage.

Three days after its shipment (November 29, 1919) a fire broke out on the No. 3 'tween deck at a point approximately 68 feet from the libelant's tobacco. Considerable difficulty was experienced in, and consequently considerable quantities of water and steam were required for, the extinguishment of this fire. The vessel had finally to be beached and the No. 3 hold to be entirely flooded by the Hoboken fire department. As a result of this flooding and of a leak in the bulkhead door between holds No. 3 and No. 2, water in No. 2 hold reached a depth of 2½ feet above the tank top on which the hogsheads of tobacco rested.

Two days after the fire, the Shipping Board sent an experienced cargo surveyor—a Mr. Kemp—to the Bellingham; this without notice to the libelant. Mr. Kemp had the tobacco removed to a lighter and examined it for damage; 12 of the hogsheads he found obviously injured. The other 89, according to both his report and his testimony, showed no outward sign of having suffered from their experience. He confined himself to removing a stave at random and feeling the tobacco with his hand. The 89 hogsheads were then reloaded into No. 2 hold in which the other cargo consisting of oil cakes and cases of meat provisions had remained. The Bellingham then proceeded upon her voyage.

Upon arrival at Rotterdam, the tobacco was discharged on to the open quay in the presence of two checkers, employees of Worms & Co., the Shipping Board's agents at that port. The checker called as a witness (deposition of Nagtegaal) testified that it was raining during this operation. At an undisclosed time thereafter, the hogsheads were removed from the quay and placed in a waterproof shed, the "Canada." After an again undisclosed period, and subsequent to January 22, 1920, another shift of the apparently orphaned tobacco occurred. This time to an open ground on which platforms of timbers and cinders had been built. The hogsheads of tobacco were covered with tarpaulin nailed to both the hogsheads and the timbers. (Testimony of Van Woerkom and Klapwijk of Worms & Co.)

The tobacco hogsheads were left as above described from this undisclosed date after January 22, 1920, until the 20th day of the following July. As was to be expected, considerable rain fell in these six months. There was some rather indefinite evidence of a strike of stevedores and port workers during that period, and also an intimation that the consignees designated in the bills of lading were financially unable to accept delivery.

On July 20th the Shipping Board's agents transferred the tobacco hogsheads to the Handelsveem warehouse, a leading warehouse in Rotterdam. The clerk, Bezemer, who received them, testified that both the hogsheads and their tobacco contents had been thoroughly damaged by water. In fact, so much so, that foul warehouse receipts were issued and accepted. On August 7th and September 11th these receipts were delivered to the Amsterdamshe Bank and to Messrs. Speulman, and in November the latter demanded a survey, which surveyors for both sides agreed showed a total loss. On June 6, 1922, the libelant filed his libels, one for general average contribution and the other for cargo damage. The final general average adjustment by the Shipping Board's adjusters, Marsh and McLennan, was not issued until February 28, 1924, although the ultimate finding seems to have been foreshadowed in a letter written in 1921.

We cannot help the feeling that, if the libelant company had been dealing with a private company rather than a semigovernmental agency, he would have been long since

compensated for his admitted loss. We say that as no reflection on the assiduous and learned representatives of the legal department of the Shipping Board who had to pass on the matter and who prosecuted it ably and vigorously before us. We have the impression, gained from a not inconsiderable experience now, that the legal departments of the government generally are unwilling to take any great responsibility themselves. Rather, whatever may be their actual opinion of the merits of a legal or factual controversy, they incline to insist upon its final resolvement by a court or courts. This attitude may effectually clear their skirts. In our humble judgment, it does not, however, incline people to do business with such government agencies as are in the field for trade.

■ Faced, then, with the ruin of this shipment, the libelant company not unnaturally sought redress. There were very obviously two concurrent courses open to him; an action for contribution in general average and an action for cargo damage. He took both, but stressed the former.

In this we think he was mistaken. If the damage to the tobacco was caused by (the result of) the steps taken to extinguish the fire, we have, it is conceded, a typical case for the application of general average. Congdon on General Average, The Northern No. 30 (D. C.) 24 F.(2d) 975. The difficulty we have is one of inference from ultimate fact. We do not believe that the tobacco in the 89 hogsheads was wet either by the direct application of water or by the indirect penetration of steam or water. We do not think that the water reached a sufficient depth in No. 2 hold to wet any but the bottom 12 hogsheads, or that any of the hogsheads were exposed for a sufficiently long period for such penetration to take place. We found Mr. Kemp's testimony credible, and in fact gather that the libelant's claim for the direct wetting and/or steam penetration rested on the surveyor's failure to examine the tobacco by means of a "break horse" (an instrument for reaching the interior of the tobacco bales) rather than upon more positive testimony.

Further, we cannot agree with libelant that harm came to the tobacco while on the ocean voyage. His theory here is based upon the condition of the other cargo in No. 2 hold which the surveyors did not remove after the fire. Although there was evidence that some oil cake had been wet, it does not appear that the moisture thus engendered either could or did penetrate the hogsheads. In fact, any such happening seems to us not only improbable but fanciful.

All the preceding reasoning would, of course, be somewhat empirical, if there was no other way of accounting for the injury by water. There is, however, a very sensible and simple way of ascribing the loss. This relates, as may be conjectured, to the happenings in and around the wharf at Rotterdam. The court is thus placing itself in the position of basing its decision on a state of facts earnestly contested by the beneficiary thereof. In so doing it, however, has the advantage of the equally earnest argument of the loser, the Shipping Board.

It seems to us rather a matter of common sense. Hogsheads of tobacco are first placed in a shed. Thereafter they are removed and piled on a timber and cinder bed·on the unprotected ground and covered with tarpaulins. There they are left for five months, four of which were in the rainy winter and spring seasons of Northern Europe. At the conclusion of this period, they are found to be thoroughly soaked.

No one saw, or would be likely to see, the encroachment of the raindrops. It might have occurred in a number of different ways. Even assuming the adequacy of the tarpaulins, repeated rains might easily have caused water to seep in through the timbers of the rough and temporary flooring. As we have said, we are forced to deal in probable inferences, and that seems to this court the most likely.

■ With respect to the legal aspects arising from this inference, the position of the parties is reversed. The learned advocate for the Shipping Board concedes, as we understand it, the rule of law, but denies its application. The rule is that, even after a carrier has deposited the goods carried on the wharf at the place of destination, his duty to the shipper is not at end. He owes a further duty (as warehouseman) of exercising reasonable care in seeing that the goods come to no harm. Cases cited, Fed. Digest, Shipping, § 126. Under no other standard could commerce with distant ports be carried on.

■ The differences between reasonable men and reasonable courts as to what constitutes reasonable care under any particular set of circumstances have been, and will continue to be, legion. The position of the learned advocate for the Shipping Board and of this court illustrates one of them. We think that it was not reasonable care to remove the tobacco from the shed into the open with the inade-

quate protection there afforded it. We are not convinced by the testimony as to the strike of dock workers, etc., that it played any part in preventing proper warehousing. Apparently the hogsheads were moved by some workers, and apparently there were other warehouses available.

The record does not require us to pass on the question of whether the Shipping Board could have freed itself from responsibility as warehousemen if it had advised libelant of its refusal to any longer act in that capacity, and the further related question of whether its Rotterdam agents, Worms & Co., are not liable for their failure to so advise.

There were argued two questions involving the libelant's technical right to bring these actions. Their decision is somewhat complicated by the pendency of a motion in another branch of this court. However that may be, it is our opinion that they are without merit.

It is first claimed that the usual notice and time to sue clause in the bill of lading has not been complied with. As we construe it, this provision has no bearing upon the present cargo damage suit. The obligation we have held to be violated by the Shipping Board is that of warehouseman. The limitation clause in the bill of lading has, in our opinion, reference only to the liability of the Shipping Board as carrier. By its terms and the obvious exigences, a different situation is created by the warehouseman's relationship.

It is also contended that the cargo damage libel is barred by the two-year limitation of the Suits in Admiralty Act of March 9, 1920 (section 5 [46 USCA § 745]). The answer here seems to be that the cause of action could not conceivably be said to have arisen until July 20, 1920, the date of the delivery of the tobacco to the Handelsveem warehouse.

Settle decree on motion.